**KILA, INC., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF ADMINISTRATION, State of Alaska, Department of Corrections, and Allvest, Inc., Appellees.**

**No. S–5237.**

Supreme Court of Alaska.

July 8, 1994.

Rehearing Denied Aug. 3, 1994.

Robert John and William R. Satterberg, Jr., Fairbanks, for appellant.

Timothy W. Terrell, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellees.

## OPINION

RABINOWITZ, Justice.

This appeal arises from the Department of Corrections' award of a contract to Allvest, Inc. for the housing of minimum security prisoners in the Fairbanks area. KILA, Inc. ("KILA"), an unsuccessful bidder, contested the award, exhausted its administrative appeals, and then appealed to the superior court. The superior court affirmed the Department of Administration's decision denying KILA's protest. This appeal followed.

## I. FACTS AND PROCEEDINGS

In August 1988, the Department of Corrections ("DOC") received authorization to seek proposals for a provider of professional services in the operation of an adult community

residential center in Fairbanks.[1] KILA and Allvest, Inc. ("Allvest") submitted bids. DOC subsequently cancelled its original Request for Proposals ("RFP"), because a change in zoning requirements rendered Allvest's proposal non-responsive, and because KILA submitted a bid beyond the amount of money that the State had allocated for the contract.[2] DOC issued a new RFP in August 1989.[3] At that time, Walter Majoros, the Director of Statewide Programs for DOC, was designated by the Commissioner of DOC, Susan Humphrey–Barnett, to serve as its procurement officer in the matter.

Majoros directed Benjamin J. Fewell, Jr., DOC's Program Coordinator, to establish and sit as non-voting chair of a Proposal Evaluation Committee ("PEC") for the purpose of evaluating proposals submitted by KILA and Allvest in response to the new RFP. DOC's Criminal Justice Planner, Marianne McNabb, submitted suggestions on the "experience and geographic location required for a PEC member to have an adequate understanding of the needs and limitations" of the residential center. However, she neither participated in the selection of individual PEC members nor contacted them regarding the evaluation of the bids.

Applying the RFP evaluation criteria, four of the PEC's five voting members rated Allvest's proposal higher than KILA's. Based on the majority vote of the PEC, Fewell recommended to Majoros that DOC negotiate a contract with Allvest. DOC then issued a notice of intent to award a contract to Allvest. KILA protested the award.

After issuance of the notice of intent, PEC member Lew Reece submitted a memorandum to Humphrey–Barnett, alleging that Fewell had imposed his own values on the PEC proceedings and skewed the outcome. He met with Ken Brown, DOC's Northern Regional Director, and also with Humphrey–Barnett. Majoros immediately investigated Reece's concerns, contacting the other PEC evaluators to determine if they thought Fewell was biased. The other four voting members stated that they believed Fewell was impartial and that they had voted independently. Humphrey–Barnett concurred with Majoros' determination that Reece's allegations were unfounded.

Allvest's original bid outlined a plan to develop a facility on Badger Road. After DOC issued the notice of intent to award the contract, local opposition to using the Badger Road site developed. Aware of the pressure regarding the location, DOC began to discuss its options. Because Allvest had proposed a location that met both the requirements of the RFP and zoning requirements, retracting the intent to award could have caused severe difficulties. Fewell, therefore, advised Majoros not to cancel and re-bid but "to continue on course and try to reach a solution" that would provide for use of the proposed Badger Road location.

On November 21, 1989, DOC signed the contract with Allvest to commence January 1, 1990, giving Allvest approximately one month to bring the facility up to specifications.[4] On the same day Tanana Chiefs Conference, Inc. ("TCC"), the owner of record, was informed

1. The purpose of the Request for Proposals was to provide housing security and other services for appropriately classified offenders whom DOC might assign to the center. Alternative placement centers of this type provide DOC with placement options for some misdemeanant offenders, and serve as halfway houses for offenders who are being released back into the community.

2. After submission of the Allvest proposal, the Fairbanks North Star Borough enacted a zoning change that denied use of the building proposed by Allvest for the purpose intended. This left KILA as the only available proposer. It was alleged that KILA's bid was approximately $185,000 higher than Allvest's bid.

3. The proposal responses were due on or before September 18, 1989. DOC received Allvest's proposal on September 15, 1989. On September 17, KILA informed DOC that although it had delivered its proposal to a private delivery service in Fairbanks, the weather conditions were so bad in Juneau that planes were unable to land. In order to promote fairness and competition, the program coordinator amended the RFP to provide for receipt of KILA's proposal. *See* 2 AAC 12.850 (authorizing extension of solicitation). Allvest objected to the amendment allowing any extension of time.

4. Allvest had concluded that it would take approximately 20 days to bring the Badger Road facility up to the required standards.

by the United States Department of Housing and Urban Development ("HUD") of potential lease problems involving the Badger Road location. As the hearing officer found, "There is no evidence outside of the viability of the TCC/HUD lease issue from which to conclude that Allvest was not a responsible proposer." As public pressure increased, including substantial pressure on HUD, Allvest contacted a local real estate agent to research the availability of other locations. The agent discovered that KILA did not own the facility it was using and eventually a lease was executed between Allvest and the property owner that would enable Allvest to use the existing facilities.

DOC denied KILA's bid protest on November 16, 1989. KILA appealed the denial of its protest on November 30, 1989. KILA also corresponded with Fewell, Humphrey-Barnett, and Larry McKinstry, an assistant attorney general, requesting "[r]easonable notice of, and right to attend any and all State meetings addressing the Allvest contract modification requests, or the KILA contract dispute, or any meeting related to such."

The Department of Administration granted KILA an administrative hearing to address the bid protest issues in dispute. A hearing was held from May 29 to June 2, 1990. Pursuant to the hearing officer's recommendations, the Commissioner of the Department of Administration denied KILA's appeal in September 1990.

■ KILA appealed the decision of the Department of Administration to the superior court. The superior court affirmed the Department of Administration's decision, and this appeal followed. On appeal, KILA raises numerous specifications of error, ultimately seeking to have DOC re-bid the contract and pay KILA's bid preparation costs.[5]

## II. DISCUSSION

### A. Alleged Bias in the Bidding Process

■ When soliciting bids for goods and services, a government agency has an implied contractual duty to consider bids in a fair and honest manner:

> [I]n exchange for a bidder's investment of the time and resources involved in bid preparation, a government agency must be held to an implied promise to consider bids honestly and fairly. Breach of this implied contract on the part of an agency entitles a disappointed bidder to recover the costs incurred in preparation of the bid.... [T]he "reasonable basis" standard for review of administrative decisions, see *Jager v. State*, 537 P.2d 1100, 1107–08 (Alaska 1975); *Kelly v. Zamarello*, 486 P.2d 906, 916–17 (Alaska 1971), is applicable in this situation.[6] See *Keco Industries, Inc. v. United States*, [203 Ct.Cl. 566], 492 F.2d 1200, 1203–04 (1974).

*King v. Alaska State Hous. Auth.*, 633 P.2d 256, 263 (Alaska 1981) (*King II*). A review of the entire record persuades us that KILA's bid was fairly and honestly considered.[7]

---

5. Allvest has fully performed the contract in question, a development which normally would moot this entire appeal. Given these circumstances, the State moved to dismiss the appeal. An individual justice of this court denied the motion, stating that "[w]hile appellant's claim that it is entitled to its bid preparation costs may be unsuccessful, the appeal is not rendered moot by the fact that the successful bidder has fully performed the contract."
 In addition, the State argues that this court should refuse to address the issue of bid preparation costs because KILA failed to raise the point at the administrative level. This is incorrect. In the November 2, 1989 notice of protest letter from KILA's counsel to the Commissioner of DOC, KILA requested that it be awarded the contract, or in the alternative, that the contract be readvertised for bid. On November 7, 1989, KILA's attorney sent the Commissioner a supple-

ment that requested bid preparation costs. Thus, KILA made the request at the appropriate time.

6. Under this standard, "we merely seek to determine whether the agency's decision is supported by the facts and has a reasonable basis in law even if we may not agree with the agency's ultimate determination." *Fairbanks N. Star Borough Sch. Dist. v. Bowers Office Prods.*, 851 P.2d 56, 58 (Alaska 1992) (quoting *Tesoro Alaska Petroleum v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987)).

7. In an administrative appeal based on the agency record, we accord no deference to the decision of the superior court and independently scrutinize the administrative action. *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987).

### 1. *KILA's Contention that Majoros Was Not Impartial*

Majoros was responsible for all DOC procurements under statewide programs.[8] KILA objects to Majoros' participation in the procurement process, claiming that Majoros was not impartial as required by AS 44.62.-350, and that his partiality resulted in a competitive advantage to Allvest.

 Alaska Statute 44.62.350 governs the appointment of hearing officers to hear and adjudicate disputes under the Administrative Procedure Act:

> The governor shall assign a qualified, unbiased, and impartial hearing officer, with experience in the general practice of law, to conduct hearings under this chapter.

Relying on this provision, KILA contends that Majoros was required to be impartial in reviewing the protest letter. However, the application of AS 44.62.350 is governed by AS 44.62.330(b), which reads in relevant part:

> The procedure of an agency not listed in (a) of this section shall be conducted under AS 44.62.330–44.62.630 only as to those functions to which AS 44.62.330–44.62.630

are made applicable by the statutes relating to that agency.

Neither the Department of Administration nor DOC are among the agencies listed in AS 44.62.330(a), and thus they are not covered by the Administrative Procedure Act.

 In addition, AS 36.30.670(a) expressly exempts from the Administrative Procedure Act informal hearings such as the one in which the Department of Administration reviewed the denial of KILA's bid protest. Therefore, AS 44.62.350 does not apply to a procurement officer's decision regarding a bid protest or to informal hearings held subsequent to a protest appeal. Nevertheless, the inapplicability of AS 44.62.350 does not relieve Majoros of the obligation to review bid protests in an impartial and unbiased manner.

 Our review of the record, and in particular our consideration of Majoros' response to KILA's letter of protest, persuades us that none of KILA's objections demonstrate bias or a lack of impartiality on Majoros' part.[9] KILA has not shown that Majo-

---

**8.** Under AS 36.30.250 and AS 36.30.560–.585, the procurement officer must make decisions on the contract award and also make the determinations necessary on protests. In determining an award of contract, a procurement officer's initial duty is as follows:

> The procurement officer shall award a contract under competitive sealed proposals to the responsible and responsive offeror whose proposal is determined in writing to be the most advantageous to the state taking into consideration price and the evaluation factors set out in the request for proposals.

AS 36.30.250(a).

**9.** In its notice of bid protest, KILA presented the following points:

1. KILA argued that several years ago, the Department of Health and Social Services rejected the facility that Allvest proposed to lease as "insufficient and inappropriate" for use as a youth facility. Majoros responded, "A decision by the Department of Health and Social Service [sic] as to the suitability of any piece of property to meet their needs for a given project has no bearing on the Department of Corrections [sic] needs or requirements for this contract."

2. KILA disputed Majoros' acceptance of Allvest's proposed location, in light of potential problems with nuisance suits, suits for taking of private property, and local zoning laws, and challenged his reliance on the negotiation pro-

cess to rectify any difficulties, claiming that the failure to address these issues was arbitrary and capricious. Majoros responded that pursuant to the RFP's requirements, Allvest provided information concerning permits, local zoning ordinances, codes, and laws, and also held a public hearing. Majoros noted that "[t]he RFP does not require total community approval, except through zoning requirements, but does provide for expression of community concern and suggestions."

3. KILA asserted that Majoros inadequately considered the effects of the alternative placement center's site upon local property values. Majoros responded that under AS 36.30.250 he could consider only price and the evaluation factors set out in the RFP, and no other factors or criteria, when making his decision.

Further, he contended, the RFP required that comments concerning defects and objectionable material in the solicitation be made in writing and received by the purchasing authority at least 10 days before the opening of the proposals. Therefore, Majoros concluded that any changes in the RFP's evaluation criteria, such as impact on property values within the vicinity of a residential center, should have been requested within that time frame. Majoros also stated that no evidence at the time of the bid indicated that if the state complied with local zoning requirements, a negative impact on local property values would occur.

ros was biased either in approving the PEC recommendation to award the contract to Allvest or in reviewing and rejecting KILA's protest letter.[10] We further conclude that none of KILA's objections prove that Allvest gained a competitive advantage by virtue of Majoros' decision. Taken individually or cumulatively, the alleged "variances" to which KILA objects are not material.[11]

### 2. KILA'S Assertion that Marianne McNabb Had a Severe Conflict of Interest in Violation of the Executive Branch Ethics Act

■ KILA asserts that DOC official Marianne McNabb's involvement in the preparation of the RFPs and her involvement in a prior program audit of Allvest's Cordova Center in Anchorage violated the Executive Branch Ethics Act, AS 39.52.010–.960.[12] Specifically, KILA argues that McNabb's prior involvement with Allvest prohibited her from participating in the bid process.[13] Prior to being hired by DOC, McNabb was employed by Allvest as vice-president of operations from October 1987 through December 1988.[14]

The hearing officer rejected KILA's contention:

KILA alleges a violation of the State ethics law although no explanation is provided as to what specific provision of AS 39.52 is alleged to have been violated. No evidence was brought forward or even hinted at that would suggest that Ms. McNabb

> In further support of its contentions of bias, KILA points to Majoros' acceptance of Allvest's allegedly deficient fire-safety plan, resident termination/walking procedures, resident medical/dental services, and disaster plan. KILA also questions Majoros' holding that the PEC did not have an affirmative duty to investigate the representations of the bidders.

10. KILA also asserts that Majoros' rejection of its bid protest was arbitrary, capricious, and an abuse of discretion. This argument is without merit.

11. A material variance from a bid specification requires rejection of the bid. *Chris Berg, Inc. v. State Dep't of Transp.*, 680 P.2d 93, 94 (Alaska 1984). A variance is material if it provides a bidder with a substantial advantage over other bidders, thus limiting or stifling competition. *Id.* All proposals for public contracts must therefore "substantially comply with all requirements contained in the invitation for proposals." *King v. Alaska State Hous. Auth.*, 512 P.2d 887, 892 (Alaska 1973) (*King I*). In *King I* we stated:

> Thus all terms of ASHA's invitation became by implication part of a valid proposal, in order that competition among redevelopers remain equal. Consistent with this well established principle courts hold that while a "material" variance from the invitation requires rejection of the proposal, a "minor" variance does not require rejection of the proposal.

*Id.* (footnote omitted). We review the agency's determination that a bid is responsive to the agency's solicitation under the reasonable basis standard. *Chris Berg*, 680 P.2d at 94.

12. Alaska Statute 39.52.150(a) provides:

> A public officer, or an immediate family member, may not attempt to acquire, receive, apply for, be a party to, or have a personal or financial interest in a state grant, contract, lease, or loan if the public officer may take or

withhold official action that affects the award, execution, or administration of the state grant, contract, lease, or loan.

Also relevant is AS 39.52.110(b):

> Unethical conduct is prohibited, but there is no substantial impropriety if, as to a specific matter, a public officer's
>
> (1) personal or financial interest in the matter is insignificant, or of a type that is possessed generally by the public or a large class of persons to which the public officer belongs; or
>
> (2) action or influence would have insignificant or conjectural effect on the matter.

13. As DOC's Criminal Justice Planner, McNabb is "responsible for the implementation and facilitation of various DOC programs with service contractors such as KILA and Allvest." She recently rewrote the DOC standards regarding the provision of services by various contractors. Her position requires that she stay in close contact with DOC contractors to ensure that they understand and comply with those standards.

14. As a former Allvest employee McNabb was responsible for its Alaska operations. KILA states that McNabb authored and approved the operations manual, which formed a portion of the submittal supporting Allvest's bid. After McNabb started work with DOC as a criminal justice planner, her activities relating to Allvest were minimal. At the request of Humphrey-Barnett in May 1989, McNabb participated in an audit of Allvest's Anchorage program to determine its compliance with DOC standards. The audit was performed independently of the contract award process and was not intended to be used in conjunction with the Fairbanks award. McNabb participated as one of three evaluators who concluded that the Allvest program was in compliance.

benefitted in any way from her former association with Allvest or that she was not honest, truthful, and unbiased in her evaluation of Allvest facilities. Ms. McNabb was not a member of the PEC and testimony established that her only involvement with the solicitation, evaluation, or award of the contract was to suggest minor changes in the scope of work section of the RFP after her input was solicited by DOC and suggested some wording changes in the final contract. No evidence was presented to suggest that her input resulted in an advantage or disadvantage for either proposer.

Our review of the record leads us to conclude that substantial evidence supports the hearing officer's findings. As the State notes, McNabb's involvement was limited to advancing some suggestions for the "scope of work" section of the RFP and the geographic and professional criteria for selecting the PEC members. McNabb had neither a personal nor a financial interest in the contract in question. Any personal or financial interest she may have had was insignificant. Therefore, her actions did not violate the Act. *See* AS 39.52.110(b)(1).[15]

■ One final observation should be made in regard to this issue: KILA contends that pursuant to AS 39.52.240, McNabb should have requested an opinion from the Attorney General as to her apparent conflict of interest. As indicated above, in the absence of any personal or financial interest in the contract, and given the fact that McNabb did not participate in or influence the PEC's contract award process, she was not required to contact the Attorney General regarding the alleged conflict.

3. *KILA's Contention that the Contract Award Process Was Permeated with Illegalities*

■ KILA also claims the State's allowance of Allvest's substitution of facilities after the award of the contract resulted in an unlawful competitive advantage to Allvest

that requires voiding the contract. In order to establish a competitive advantage, KILA must prove that a "material" variance was effected in the contract:

> Not all amendments to competitively bid contracts are prohibited, only those regarded as material. The concept of materiality in this context has not been satisfactorily captured in a single phrase. One court has spoken of "an essential change of such magnitude as to be incompatible with the general scheme" of competitive bidding; another has phrased the question to be whether the amendment "so varied from the original plan, was of such importance, or so altered the essential identity or main purpose of the contract, that it constitutes a new undertaking." These formulations simply recognize that the materiality concept prohibits those changes which tend to be subversive of the purposes of competitive bidding.

*Kenai Lumber v. LeResche*, 646 P.2d 215, 221 (Alaska 1982) (footnotes omitted).[16] Five factors determine whether a contract change constitutes a "material" variance:

> (1) the legitimacy of the reasons for the change;
>
> (2) whether the reasons for the change were unforeseen at the time the contract was made;
>
> (3) the timing of the change;
>
> (4) whether the contract contains clauses authorizing modifications; [and]
>
> (5) the extent of the change, relative to the original contract.

*Id.* (footnotes omitted).

The hearing officer applied the five factors and concluded that the amendment "was not a major variation of the original plan nor did it so alter the essential identity or main purpose of the contract that it constituted a new undertaking." Based on the facts, supporting testimony, and evidence presented, the hearing officer determined: (1) that there were legitimate reasons for the change in facilities; (2) that DOC did not foresee the

---

15. The exemption found in AS 39.52.110(b)(2) is also applicable since McNabb had no role in the PEC evaluation process and did not affect its outcome.

16. *Cf. supra* note 11 (citing similar rule for variance in bids from an RFP).

reasons for the change at the time the contract was signed, and that Allvest acted in good faith; (3) that given the necessity to have an operative facility by January 1, 1990, the contract amendment was timely; (4) that the State consistently allows contract modifications when they are in its best interests;[17] and (5) that the modification did not interfere with the "intent" of the contract—to secure a correctional facility in the Fairbanks area—and that "[t]he specific site of the facility was not relevant to the functioning of the program." We conclude that the hearing officer's factual findings have substantial support in the record and that his interpretation of "material variance" has a reasonable basis in law.

KILA advances numerous other improprieties and alleged illegalities in the contracting process. Our review of these points in light of the entire record and applicable law persuades us that none have merit.[18]

### B. *KILA's Contention that the State Violated the Open Meetings Act*

■ KILA argues that the Open Meetings Act ("Act"), AS 44.62.310–.312, required that it be granted reasonable notice of, and the right to attend and participate in, meetings concerning the disposition of KILA's contract, the Allvest contract modification requests, and KILA's contract dispute. Contending that the State failed to give public notice of these meetings and denied KILA's representatives access to them, KILA urges us to void any actions modifying the contract.

The state argues that neither DOC nor the Department of Administration violated the Act because the Act does not apply to informal groups of state employees who have no power to take collective action by vote. More particularly, the State notes that

> McKinstry, Fewell, Weimar and Majoros were not part of any formally appointed or constituted body. No statute, regulation or formal administrative action created this group as a collective entity, nor were these persons appointed or elected to the group. As a collective entity they had no powers, and could take no actions. They could not take action by a group vote.

The State further contends that no "meetings" to discuss contract modifications by any official or even informal "bodies" took place. The "meetings" in question consist of two separate teleconferences held between Majoros, Fewell, McKinstry, and the president of Allvest. The hearing officer declined to apply the Act to KILA's appeal because of the nature of the meetings at issue. The hearing officer found that the meetings were "informal" and that it would be "impossible to apply [the Act] to the everyday dealings of public employees when they meet with each other and those outside of State government in the day-to-day conduct of this State's business."

We agree. Alaska Statute 44.62.310(a) provides in relevant part:

> All meetings of a legislative body, of a board of regents, or of an administrative body, board, commission, committee, subcommittee, authority, council, agency, or

---

17. After reviewing Allvest's request for a change in the facility's location, Fewell contacted both the Department of Administration and the Attorney General's Office. He requested advice concerning the requirements of the procurement code and whether the change in location would constitute a modification in the contract so severe as "to warrant not allowing the request." Both the Department of Administration and the Attorney General's Office indicated that the modification was permissible.

18. KILA argues that DOC's cancellation of the first RFP was improper. Since KILA did not protest DOC's cancellation of the first RFP on appeal to the superior court, the issue is not properly before us. KILA further contends that Allvest's bid was in numerous respects nonre-

sponsive. We find no merit in this specific contention.

In addition, KILA argues that under AS 44.62.-350(c) the hearing officer was unqualified in that he had not been admitted to practice law for at least two years immediately before his appointment. This contention has little merit. First, review of the record shows that KILA waived this contention by not raising it at the administrative level. Second, AS 36.30.630 provides that hearings held on public contract controversies "shall be conducted according to AS 36.30.670," which in turn expressly exempts hearings under AS 36.30 from the Administrative Procedure Act, AS 44.62. Alaska Statute 36.30.670 does not require that hearing officers appointed under that chapter be admitted to the practice of law.

other organization, including subordinate units of the above groups, of the state or any of its political subdivisions, including but not limited to municipalities, boroughs, school boards, and all other boards, agencies, assemblies, councils, departments, divisions, bureaus, commissions or organizations, advisory or otherwise, of the state or local government supported in whole or in part by public money or authorized to spend public money, are open to the public except as otherwise provided by this section.[19]

KILA has presented no evidence that these informal meetings were held by governmental units whose actions come within the ambit of AS 44.62.310. This statute contemplates meetings of a governmental body, including subordinate units thereof. Under the particular facts of this record we hold that the Act did not apply to the individuals who participated in the two meetings now questioned.

## III. CONCLUSION

KILA has failed to prove that any of the DOC officials involved acted in bad faith, were biased, or lacked impartiality. Further, KILA failed to demonstrate that the hearing officer for the Department of Administration lacked a reasonable basis for his conclusion that Allvest's bid was responsive. KILA's arguments that Majoros was biased, that McNabb had a conflict of interest, and that the process was permeated with illegalities are meritless. Finally, KILA failed to show any violation of the Open Meetings Act. Thus, the contract between DOC and Allvest is not voided, and KILA is not entitled to its bid preparation costs.

AFFIRMED.

**19.** We have broadly construed the policy objectives of the Act, as stated in AS 44.62.312, to encourage openness in government dealings:

Given the strong statement of public policy in AS 44.62.312, the question is not whether a quorum of a governmental unit was present at a private meeting. Rather, the question is whether activities of public officials have the effect of circumventing the [Act].

*Brookwood Area Homeowners Ass'n v. Municipality of Anchorage*, 702 P.2d 1317, 1323 n. 6 (Alaska 1985). In *Brookwood*, we defined a "meeting" to encompass "every step of the deliberative and decision making process when a governmental unit meets to transact public business." *Id.* at 1323.