908 P.2d 994 (1995)
PAUL WHOLESALE, B.V./HOLS TRADING, GMBH, J.V., Appellant,
v.
STATE of Alaska, DEPARTMENT OF TRANSPORTATION AND PUBLIC FACILITIES, Anchorage International Airport; David Green Group, A Joint Venture, Appellees.
DAVID GREEN GROUP, A Joint Venture, Cross-Appellant,
v.
PAUL WHOLESALE, B.V./HOLS TRADING, GMBH, J.V.; State of Alaska, Department of Transportation and Public Facilities, Anchorage International Airport, Cross-Appellees.
No. S-6658.
Supreme Court of Alaska.
December 22, 1995.
*995 Bruce E. Davison and Shelby Nuenke-Davison, Davison & Davison, Inc., Anchorage, for Paul Wholesale, B.V./HOLS Trading, GmbH, J.V.
Elizabeth J. Hickerson, Assistant Attorney General, Anchorage, Bruce M. Botelho, Attorney General, Juneau, for State of Alaska.
Robert J. Dickson, Atkinson, Conway & Gagnon, Inc., Anchorage, for David Green Group, a Joint Venture.
Before: RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

OPINION
EASTAUGH, Justice.

I. INTRODUCTION

After soliciting public bids for a five-year contract to operate the duty-free concession at Anchorage International Airport (AIA), AIA awarded the contract to the second highest bidder, David Green Group d/b/a Aero Trading (DGG). AIA is a sub-agency of the Alaska Department of Transportation and Public Facilities (DOT & PF). AIA awarded the contract to DGG after determining that the high bidder, Paul Wholesale B.V./HOLS Trading, GmbH, A Joint Venture (PW), did not have the requisite retail experience. PW protested and appealed to the superior court. While PW's appeal was still pending, DOT & PF cancelled the solicitation. DOT & PF also took the position that an order of this court entered in a prior appeal taken by PW invalidated the contract with DGG. In view of DOT & PF's cancellation of the solicitation, the superior court then dismissed PW's appeal as moot. PW and DGG both appeal. Each argues it should be awarded the contract. We affirm the superior court's dismissal for mootness because we hold that DOT & PF had a reasonable basis to cancel the solicitation.[1]

II. FACTS AND PROCEEDINGS

In February 1994 AIA, a sub-agency within DOT & PF, solicited public bids for the operation of AIA's duty-free concession and for general merchandise sales in AIA's north terminal. AIA conducted a prebid conference on March 15, to allow prospective bidders *996 to recommend changes in the bid requirements.[2] AIA received two written comments from potential bidders on March 17. In response to the suggestions made by potential bidders, AIA changed some of the bid provisions and revised the invitation to bid.
On March 25, after the comment period closed, a potential bidder, DGG, wrote AIA requesting alteration of the financial information requirement so that DGG could be a responsive bidder. DGG wrote: "If a workable exception to this requirement of audited financial statements for Alaskan businesses who might otherwise qualify as bidders could be worked out, we might then be able to enter a qualifying-responsive bid." DGG was an Alaskan concern. On April 6 AIA issued an addendum that permitted as an alternative to two years of audited financial statements, "limited review financial statements" with the two most recent annual U.S. income tax returns.
PW, a Dutch and German joint venture, submitted one of only three bids received by AIA.[3] Although PW's bid contained the highest minimum monthly guaranteed income, AIA determined that PW did not have the necessary retail experience, and that PW had not submitted a bid deposit that complied with the bidding requirements. AIA notified PW that it intended to award the contract to DGG, the second highest bidder. Upon learning of AIA's rejection of its bid, PW provided AIA with additional information about its retail experience.[4] PW formally protested to DOT & PF the notice of intent to award the contract to DGG; PW attributed any failure on its behalf to meet the responsiveness requirements to ambiguous bid documents. On May 20 DOT & PF concluded that the bid documents could be interpreted to require either retail or wholesale experience. Consequently, DOT & PF directed AIA to rescind its notice of intent to award to DGG, and instead, to issue an intent to award to PW.
DGG then filed suit in the superior court, seeking a temporary restraining order, a preliminary injunction, and summary judgment to prevent AIA from entering into a contract with PW. DGG also administratively appealed DOT & PF's decision. On June 3 DOT & PF denied the appeal and directed AIA to issue an award to PW. DOT & PF concluded that it was in AIA's best interest to waive any defects in PW's bid since PW submitted the highest monthly minimum guarantee and was found to be responsive, responsible, and qualified. AIA awarded the contract to PW on June 6.
On June 30 the superior court granted summary judgment in favor of DGG, permanently enjoined AIA from awarding the concession contract to PW, and ordered the State to award the contract to DGG. AIA awarded DGG the contract and expedited its execution. The State and DGG signed the five-year term concession contract on July 13. It required DGG to begin concession sales on September 1, 1994.
PW filed an emergency appeal in this court seeking review of the June 30 summary judgment and injunction. We heard PW's appeal on August 8. On August 10 we issued an order which reversed the superior court's June 30 order awarding the bid to DGG and vacated the injunction against award of the contract to PW. We remanded the case to the superior court with directions to remand the proceeding to DOT & PF to (1) make findings whether the bid documents require retail experience; (2) make findings whether PW had, in fact, the retail experience required *997 by the bid documents; and (3) certify those findings to the superior court.
DOT & PF interpreted our reversal of the superior court's order as invalidating the contract with DGG. Consequently, AIA informed DGG that DGG had no contract because of the supreme court order.
DOT & PF delegated authority to Lowell Humphrey, the Airport Director, to make the required findings on remand. On August 17 Humphrey filed findings with the superior court certifying that (1) the bid documents required retail experience and (2) PW did not demonstrate the retail experience required by the bid documents. PW moved in the superior court to vacate the findings, requested a trial de novo on the issue of retail experience, and requested reinstatement of the concession agreement to PW. On August 23 PW filed and personally served a memorandum containing a description of events allegedly demonstrating that AIA had engaged in improprieties and "actual favoritism and personal bias" for DGG and against PW. PW also filed and personally served the same day an affidavit executed by attorney Thomas P. Owens, Jr., describing events which PW claims demonstrated bias and favoritism by AIA for DGG and against PW.
On August 24 DOT & PF advised PW and DGG that it had "decided to cancel the invitation for bid" for the AIA duty-free concession. The next day, DOT & PF filed a motion to dismiss the entire superior court case because "recent action" by DOT & PF rendered all issues moot. In support, DOT & PF submitted the affidavit of Michael A. Barton, the DOT & PF Commissioner. Commissioner Barton affied that he had determined that (1) the solicitation "contained specifications that were subject to more than one reasonable interpretation"; (2) "allegations of irregularity" raised a "possible appearance of impropriety that may undermine public confidence in the integrity of the procurement process"; and (3) the costs and delay "caused by the foregoing, together with protection of public confidence in the procurement," rendered an award "not in the best interest of the State." PW opposed the motion for dismissal. DGG filed two motions for a temporary restraining order and a permanent injunction to enjoin AIA and DOT & PF from rejecting all bids and cancelling the invitation to bid. DOT & PF opposed DGG's motions.
DOT & PF secured a new agreement with the incumbent contractor to continue to operate the concession beyond August 31. On September 7 the superior court heard oral argument on the pending motions of DOT & PF and DGG. On September 26 the superior court issued a final order granting DOT & PF's motion to dismiss and denying DGG's motions for injunctions. PW appealed. We granted PW's motion to consider the appeal on an expedited basis. DGG cross-appealed.
AIA issued a new invitation to bid for the duty-free and general merchandise concession on October 7. The new invitation unambiguously states that retail experience is required for a bidder to be eligible for award of the contract. Bids on this offering were due December 14, 1994. After hearing argument on the appeals on December 12, we stayed the opening of the bids.[5]

III. DISCUSSION

PW argues that the superior court erred in dismissing the case because DOT & PF improperly cancelled the invitation to bid. DOT & PF responds that the court correctly dismissed the case because a reasonable basis supported cancellation of the invitation; the bid protest appeal was consequently moot. DOT & PF claims to have acted within its discretion in cancelling the contract solicitation.

A. Standard of Review

To determine whether the superior court erred in dismissing the case, we must consider whether DOT & PF acted within its discretion in cancelling the solicitation. Thus, we review the bid cancellation under the standard of whether there was a reasonable basis for the administrative decision. *998 Kila, Inc. v. State, Dep't of Admin., 876 P.2d 1102, 1105 (Alaska 1994); Dick Fischer Dev. No. 2, Inc. v. Department of Admin., 838 P.2d 263, 266 (Alaska 1992); Jager v. State, 537 P.2d 1100, 1107-08 (Alaska 1975).

B. DOT & PF's Cancellation of the Solicitation Had a Reasonable Basis

DOT & PF argues that it cancelled the solicitation because an award was not in the public interest since (1) the bid specifications were ambiguous and might lead to an award to a bidder without sufficient retail experience to serve the public adequately; (2) the allegations associated with the procurement procedures raised the appearance of impropriety that might undermine the public confidence in the procurement process; and (3) cancellation would avoid continued litigation that would not cure the problems associated with the procurement.
PW and DGG challenge each of these rationales. We will address each in turn.

1. Ambiguous qualifications

The bid documents discuss bidder qualifications:
To participate in this bid offering, a bidder must demonstrate at least four years of qualifying experience since January 1, 1990. A year of qualifying experience is defined as one period of twelve consecutive months in owning and operating either a duty-free and/or general merchandise retail business that generated gross sales of at least $1.0 million per year.
(Emphasis added.)
AIA, DOT & PF, the superior court, and the bidding parties have interpreted the provision differently throughout the process. DGG argues that the bid invitation required retail experience. PW and DOT & PF both agree that the bid qualifications were ambiguous regarding retail experience. It was PW's theory below that "retail" could be read to modify only "general merchandise" and that consequently duty-free wholesale business could be counted as qualifying experience. AIA intended the qualification provision to require either duty-free retail or general merchandise retail experience. AIA apparently did not anticipate that wholesale duty-free experience would qualify. DOT & PF concluded in May that it was reasonable to interpret the bid qualifications as requiring either retail or wholesale duty-free experience. In June DOT & PF and AIA opposed DGG's motions for preliminary injunction and summary judgment, in part on the ground the bid invitation could be read to allow wholesale duty-free experience. Yet, when asked by this court in August to clarify whether the bid documents required retail experience, DOT & PF certified that they did. The superior court concluded that the bid documents required retail experience. At a minimum, the varying interpretations demonstrate that the bid document language is far from clear.[6] The provision could reasonably be read to permit duty-free wholesale experience to qualify. We conclude that DOT & PF had a reasonable basis for finding that the qualifications were ambiguous.
We consider the state procurement code, state regulations, and airport procurement regulations in deciding whether ambiguity could be a basis for cancelling a bid solicitation. Although AS 36.30.850(b)(8) exempts AIA from the state procurement code, the code may be used as a guide for airport procurements. Alaska Statute 36.30.350 provides in pertinent part that "[a]n invitation to bid ... may be cancelled or any or all bids ... may be rejected in whole or in part ... when it is in the best interests of the state in accordance with regulations adopted by the commissioner." AS 36.30.350. Similarly, although 2 Alaska Administrative Code (AAC) 12.860 was adopted under the state procurement code, it provides guidance to AIA in procurement decisions. 2 AAC 12.860 provides in part:
After the opening of bids or proposals or after notice of intent to award but before *999 award, all bids or proposals may be rejected in whole or in part by the chief procurement officer or the head of a purchasing agency issuing the solicitation. Reasons for rejection include the following:
....
(2) ambiguous or otherwise inadequate specifications were part of the solicitation; (3) the solicitation did not provide for consideration of all factors of significance to the state;
....
(7) the award is not in the best interests of the state.
Airport procurement regulations provide that DOT & PF "will, in its discretion, for any reason, reject all proposals or withdraw the competitive proposal offer." 17 AAC 40.340(e)(5) (emphasis added). Although this regulation uses the word "proposal," DOT & PF argues that the regulation governs the procedures for competitive bids. Clearly, this regulation provides DOT & PF with broad discretion.
Additionally, the invitation to bid expressly allows AIA to reject any bids if rejection is in the airport's best interest:
The Airport reserves the right to reject any bids and to waive any defect if it determines that rejection or waiver is in the Airport's best interest. In addition, the Airport reserves the right to advertise for new bids or to award the concession privilege in any manner it believes is in its best interest. The Airport is not obligated to enter into any agreement with any bidder. The Airport is not responsible for any cost associated with the preparation or submission of bids.
The contract, statutes and regulations give DOT & PF broad authority to cancel a solicitation.
DGG argues that ambiguity would not be a sufficient basis for cancelling the solicitation. In effect, PW argues that the ambiguity is irrelevant, because PW provided supplemental (post bid-opening) information that satisfied the qualifying requirements, and that as high bidder, it should be awarded the contract. The dissenting opinion also notes that ambiguity could not justify cancelling the solicitation because, PW having submitted supplemental qualifying information, DGG gained no competitive advantage. Dissent at 1005.
We need not and do not decide whether ambiguity alone would justify cancelling the solicitation, because ambiguity was only one of the grounds for cancelling the solicitation, and because DOT & PF concluded that the three reasons "together with protection of public confidence in the procurement, render award not in the best interest of the State." As we previously noted, DOT & PF had a reasonable basis to find that the qualification provision was ambiguous ("subject to more than one reasonable interpretation"). We conclude that it was reasonable for DOT & PF to include ambiguity in the reasons for cancellation and that when viewed together, the reasons given by DOT & PF justified DOT & PF's finding that award was not in the State's best interest.
Further, although DGG and PW each argue that any ambiguity would not justify cancellation (and also that each is entitled to be awarded the contract), the materiality of the dispute about the meaning of the qualifications provision is evident from the fact DGG and PW still actively dispute whether PW (or DGG) satisfied the experience requirements as written or as interpreted at different times by AIA and DOT & PF.[7] *1000 But for the September 26 order of dismissal, it is likely the parties would still be litigating that dispute in the superior court. DOT & PF was not unreasonable in thinking cancellation would do more to protect the public interest than continued litigation about what the solicitation meant. Considering that DOT & PF possesses broad discretion and can reject bids "for any reason," DOT & PF did not abuse its discretion by relying on ambiguity as one of the reasons for cancelling the solicitation.

2. Appearance of impropriety

On August 23, 1994, PW filed and personally served on the Department of Law attorney representing AIA and DOT & PF in the superior court (1) a detailed memorandum chronologically discussing events PW argued supported its claim that AIA was biased against PW and for DGG, and (2) the affidavit of Thomas P. Owens, Jr. DOT & PF announced the cancellation August 24, and on August 25 Commissioner Barton executed his affidavit listing the appearance of impropriety as a ground for cancellation.
On appeal PW lists nineteen allegations of possible impropriety demonstrating AIA or DOT & PF favoritism to DGG, but argues that agency improprieties do not justify cancellation, that PW should be awarded the contract, and that improprieties attributable to DGG should eliminate it as a bidder.
DGG argues the alleged appearance of impropriety did not justify cancellation. It focuses on the innocence of its March 25, 1994, letter to AIA, while ignoring the remainder of PW's catalogue of asserted improprieties.
DOT & PF claims that the appearance of impropriety supports its cancellation of the bids. DOT & PF relies on this court's decisions in Dick Fischer Development No. 2, Inc. v. Department of Administration, 838 P.2d 263 (Alaska 1992), and McBirney & Associates v. State, 753 P.2d 1132 (Alaska 1988), for the proposition that "the appearance of impropriety and impropriety in fact are sufficient to void procurement contracts."
McBirney involved the State's attempt to consolidate the state offices in downtown Fairbanks through a sole source procurement to McBirney. 753 P.2d at 1132-33. The Attorney General's Office advised the State to void the contract "because the Grand Jury findings revealed that the lease was `tainted by favoritism.'" Id. at 1135. The State cancelled the lease and McBirney sued. Id.
On appeal, we reviewed the purposes and requirements of public bidding:
It has been said about the competitive bidding process generally that "[t]he whole matter is to be conducted with as much fairness, certainty, publicity, and absolute impartiality as any proceeding requiring the exercise of quasi-judicial authority."
In keeping with this rule, courts have guarded against the award of a public contract to a bidder who has received an unfair competitive advantage over other bidders.
Id. at 1136 (footnotes and citation omitted). We concluded that "the impropriety derives from the fact that the suggestions [by McBirney to the governor's office] were made outside the purview of other bidders and the public." Id. at 1138. Thus, we held that the State permissibly voided the lease due to the bidding irregularities. Id.
In Fischer, the State accepted Fischer's bid for the construction of the Anchorage Office Complex (AOC). 838 P.2d at 265. Before bid protests could be resolved, the State cancelled the AOC project, giving three reasons for the cancellation: lack of legislative support, problems with financing, and impropriety surrounding the bidding process. Id. at 266. On appeal, we considered whether there was a reasonable basis for the State's decision to cancel the project. Id. Regarding the third reason, the issue was "whether the mere appearance of impropriety is enough to taint the entire bidding process." Id. at 267. We noted that "[e]ven the appearance of impropriety threatens the goals of the process...." Id. We held that an ex parte communication between the State and a one time agent of Fischer gave rise to "the appearance of impropriety." Id. We further held "that the concern over impropriety in the bidding process was sufficient to support the State's decision to cancel *1001 the project."[8]Id. We concluded that any of the three reasons was enough to justify the State's cancellation of the project. Id. at 266.
PW argues that those cases are distinguishable because they concerned cancellations due to the improprieties of the successful highest bidder, not the second highest bidder. Notwithstanding that distinction, PW reads those cases too narrowly. Fischer and McBirney demonstrate that impropriety can be grounds for cancellation of bidding, regardless of who is involved in the impropriety.[9] Further, PW has argued vigorously that the State also engaged in impropriety. Given PW's allegations, the policy behind Fischer and McBirney is equally applicable here.
In arguing that DOT & PF should not have cancelled the solicitation, DGG disputes that AIA expressed any bias against PW. DGG asserts, however, that even if bias existed, such bias is not critical if the record supports the award. DGG reasons that if there is a rational basis for the decision to award the contract, any bias is immaterial.
DGG relies on Fischer, 838 P.2d at 266, to support its argument that if there is a reasonable basis for the administrative decision to award a contract, the existence of subjective bad faith by the decision maker does not require the decision to be overturned. However, Fischer does not stand for that proposition. In Fischer, we looked to Keco Industries, Inc. v. United States, 492 F.2d 1200, 203 Ct.Cl. 566 (1974), which listed four factors to aid in identifying a wrongful rejection:
(1) subjective bad faith on the part of the officials, depriving the bidder of fair and honest consideration of the proposal; (2) proof that there was no reasonable basis for the administrative decision; (3) the amount of discretion entrusted to the procurement officials; and (4) violation of a pertinent statute.
838 P.2d at 266 (citing Keco, 492 F.2d at 1203-04).
Whether an agency had a reasonable basis for its rejection of bids or cancellation of a project does not necessarily eliminate the significance of an alleged impropriety. First, the factors listed in Fischer are "four subsidiary, but nonetheless general, criteria controlling all or some of these claims." King v. Alaska State Hous. Auth., 633 P.2d 256, 263 n. 7 (Alaska 1981) (emphasis added). We have specifically stated "that proof that there was `no reasonable basis' for the administrative decision will also suffice, at least in many situations," to demonstrate the agency's conduct was arbitrary and capricious. Id. (emphasis added). Despite DGG's representations to the contrary, this court has not concluded that an agency decision which has a reasonable basis must be upheld even in the face of the appearance of impropriety. *1002 "Subjective bad faith" and "no reasonable basis" are only two factors for consideration. The court must also consider the other factors  the amount of agency discretion, and whether the agency violated the relevant law. Additionally, "[t]he application of these four general principles may well depend on (1) the type of error or dereliction committed by the Government, and (2) whether the error or dereliction occurred with respect to the claimant's own bid or that of a competitor." Id. Thus, DGG's argument that DOT & PF should not cancel a "correct decision," even when the decision maker was biased, is not persuasive.
Although DOT & PF primarily focuses on one event suggesting impropriety  DGG's March 25 letter to AIA seeking an exception to a bid requirement  DOT & PF refers in its brief to PW's other assertions. Likewise, its notice of cancellation referred to PW's allegations made in the superior court. Several of PW's allegations potentially create the appearance of agency impropriety.
In its March 25 letter to AIA, DGG stated: "If a workable exception to this requirement of audited financial statements for Alaskan businesses who might otherwise qualify as bidders could be worked out, we might then be able to enter a qualifying-responsive bid." Consequently, AIA added Addendum No. 3 which changed the requirement pursuant to DGG's request.[10] DGG's communication with AIA, after the public comment period closed, directly resulted in the issuance of Addendum No. 3. Without Addendum No. 3, DGG may have been unable to bid on the contract.
PW also claimed that after the May 3 bid opening revealed PW was the highest bidder, a DGG principal called AIA, left an "urgent" request to be called back, and arranged a May 5 meeting with AIA to review the PW bid documents. According to PW, an AIA memorandum adopting DGG's adverse interpretation of the PW bid was written after the May 5 DGG-AIA meeting, but was backdated to May 3.
Additionally, DOT & PF admits that a discussion between DOT & PF Central Region Director Horn, current AIA Director Humphrey, DOT & PF Commissioner Campbell, and Deputy Commissioner Sandvik, which occurred before Horn issued his May 20 decision, may have compromised Horn's independence. In his decision, Horn states that he considered DGG's May 17 and 18 protest documents, as well as all other documents relevant to PW's bid. However, an electronic mail message regarding the DOT & PF-AIA discussion suggests that Horn may not have independently decided the issue.[11] While the electronic mail message does not prove any faulty procedure, it contributes to an appearance of impropriety when considered in conjunction with other circumstances regarding the bidding.
When DGG protested the May 20 decision to award PW the contract, DGG requested that "a person who has not had a prior involvement in these issues be designated to decide the David Green Group protest." DGG questioned whether DOT & PF was in "a position to offer a fair and impartial officer to decide this bid protest," considering that both the Commissioner and Assistant *1003 Commissioner had already committed themselves on two appeal issues. DOT & PF denied DGG's request and DOT & PF Central Region Director Horn decided the protest despite his prior involvement. DOT & PF admits that "in retrospect, it would have been more appropriate if another agency employee had ruled on the appeal rather than Horn, as argued by DGG."
DOT & PF also admits that "it would have been more consistent with the bid documents if the Central Region Director, rather than the Airport Director, had issued the findings of facts pursuant to the Alaska Supreme Court's August 10th order." This court remanded to the superior court to remand to DOT & PF to make specific findings.[12] DOT & PF, however, delegated authority to Airport Director Humphrey to make the findings on remand.
Further, PW offered the Owens' affidavit concerning a conversation with Airport Director Humphrey.[13] Owens' description of the conversation supported an inference AIA was biased toward awarding the contract to an Alaskan company:
On the evening of May 7, 1994, I was introduced to Lowell Humphrey, at the Egan Center, during the Catholic Social Services Ball. He was introduced to me as the manager of the International Airport. I had not met him before. After introductions, I stated that I understood the Airport had just awarded the duty-free contract to the Pauls Group. Mr. Humphrey became somewhat agitated and stated the Airport would NEVER award that contract to an "off-shore" company and that they had awarded it to a "local" group. This is not a direct quote (curse words omitted), but very close. Mr. Humphrey made his statement in a deliberate and determined manner. Mr. Humphrey made an additional comment to the effect that the contract would only go to a "local" contractor, but I cannot remember his exact words. I did not comment further, and the conversation soon ended.[[14]]
Owens' affidavit alleged bias by Humphrey, DOT & PF did not offer a rebutting affidavit from Humphrey or anyone else, and Humphrey made the August 16 decision that favored DGG following our August 10 remand. The Owens affidavit consequently provided some support for PW's claims that the process was tainted by impropriety.
We need not and do not decide whether PW's account of those events was accurate or whether PW's assertions of impropriety were *1004 valid. It is enough that PW's assertions were not patently frivolous. Considering the circumstances and allegations in the aggregate, DOT & PF had a reasonable basis to conclude that there was "a possible appearance of impropriety that may undermine public confidence in the integrity of the procurement process." Given the nature of PW's allegations and the content of the Owens' affidavit, DOT & PF could permissibly choose to cancel the solicitation. It was not required to mount a costly and lengthy judicial rebuttal that, even if successful in court, might ultimately fail to remove a public perception of taint. DOT & PF argues on appeal that cancellation was "the only reasonable way" to ensure that "the process was above reproach." It is not necessary to decide whether that approach was the only reasonable way to achieve that goal; under the circumstances it was not unreasonable to select that approach.

3. Cost and delay of litigation

DOT & PF also contends that the cost and delay of the present litigation justified cancellation of the solicitation. PW argues that cancelling a bid invitation because an aggrieved bidder used the bid protest procedures would set a poor precedent and undermine the integrity of the public procurement process.
If DOT & PF had investigated or litigated the allegations of impropriety, without cancelling the solicitation, the resulting delay would have extended long past September 1, 1994, the date the concession was supposed to begin. Further, if DGG had begun operating the concession on September 1, and the investigation later revealed that DGG had acted improperly during the process, litigation to rescind the contract would likely have ensued. Full exploration of PW's charges of impropriety would have resulted in substantial expense and delay, and likely would have distracted DOT & PF, AIA, and State officers from other duties. Further, PW and DGG still disagree about whether either satisfied the bid qualifications. The potential cost and delay associated with such disputes would have been great. As such, there was a reasonable basis for DOT & PF to rely on this factor as one of the reasons for cancellation.

4. Summary

The contracting agency's authority to reject any or all bids is broad. 17 AAC 40.340(e)(5) (stating that DOT & PF "will, in its discretion, for any reason, reject all proposals or withdraw the competitive proposal offer"). DOT & PF's decision to cancel the offering, reject all bids, revise the bid documents, and reissue the offering was not unreasonable under the circumstances. We conclude that DOT & PF had a reasonable basis for cancelling the solicitation and did not abuse its discretion.

C. Cancellation of the Solicitation Mooted the Appeal

The superior court refused to consider whether PW demonstrated retail experience because the court concluded that as a result of the cancellation "the underlying procurement challenge is now moot."
PW argues that we should not consider the appeal moot because DOT & PF would be able to preclude judicial scrutiny of improper conduct by simply cancelling a solicitation, declaring all bid protests moot, and ordering a rebid. PW contends that this would detract from the public's confidence in the procurement system and would create a disincentive for bidders to enforce their rights and ensure a fair and open system of bidding. Thus, PW argues that finding this case moot would harm the public interest.
DOT & PF argues that the bid protest which prompted this appeal is moot because DOT & PF cancelled the solicitation and rebid the concession contract.
We have concluded that DOT & PF did not abuse its discretion in cancelling the solicitation and rebidding the contract. Consequently, the previous solicitation no longer exists, and the remaining issues on appeal are moot. "A claim is moot if it has lost its character as a present, live controversy." Kleven v. Yukon-Koyukuk School Dist., 853 P.2d 518, 523 (Alaska 1993) (quoting United *1005 States v. Geophysical Corp., 732 F.2d 693, 698 (9th Cir.1984)).[15]

IV. CONCLUSION

We AFFIRM the superior court's final order dismissing the action below.
MOORE, C.J., not participating.
COMPTON, Justice, dissenting.
In my view the three reasons proffered by DOT & PF for cancelling the bid solicitation are not supported by the record. I would therefore hold that there was no reasonable basis for DOT & PF's decision to cancel the bid solicitation.

I.
PW complains that the bid solicitation was ambiguous in that "duty free and/or general merchandise retail business" was susceptible to different meanings. First, I do not agree with the court's conclusion that this clause is ambiguous. The fact that different parties placed different interpretations on the clause seems hardly conclusive that the clause is ambiguous. See, e.g., Village Inn Apts. v. State Farm Fire & Cas. Co., 790 P.2d 581, 583 (Utah App. 1990) (A contract term "is not ambiguous ... merely because one party assigns a different meaning to it in accordance with his or her own interests."). Given the public's present-day perception of the legal profession, conjuring an ambiguity out of the plain language of the bid solicitation clause may be seen by some as "lawyers at play in the halls of our court."
As a bid solicitation is an implied contract, King v. Alaska State Hous. Auth., 633 P.2d 256, 263 (Alaska 1981), it is appropriate to borrow from the principles of contract construction. "Common sense and good faith are the leading characteristics of all constructions of contracts." 17A Am.Jur.2d Contracts § 342 (1991). The court concludes that "the provision could reasonably be read to permit duty-free wholesale experience to qualify," but does not elaborate. I believe the only common sense reading of the bid solicitation clause is that it requires retail experience, either duty-free or general merchandise.[1]
Second, and more importantly, the court's conclusion that the clause is ambiguous is irrelevant. DGG gained no competitive advantage over PW, since PW was permitted to provide evidence that it met the retail experience requirement. After submission of this evidence, DOT & PF determined that PW did not have the requisite retail experience. That determination has not been reviewed, in view of DOT & PF's cancellation of the solicitation. Since the conclusion that the retail experience clause is ambiguous is irrelevant, it cannot support the bid cancellation.

II.
PW complains that DOT & PF was biased against it, as it was not a local business. The evidence for this comes from two incidents.[2] *1006 First, DGG submitted an untimely written request to DOT & PF that the bid requirements be amended to allow for "limited review financial statements" in place of audited balance sheets. DOT & PF acceded to this request, and so amended the bid solicitation. Written comments and suggestions on the bidding terms were permitted, and DGG's comments were of public record. This case is therefore unlike McBirney & Assocs. v. State, 753 P.2d 1132 (Alaska 1988), where the ex parte communications were not public record. Id. at 1138 ("[T]he impropriety derives from the fact that the suggestions were made outside the purview of other bidders and the public."). PW does not suggest that the alteration was impermissible even if it did broaden the pool of prospective bidders. It would be hard pressed to make such a complaint, since it is in the public interest that as many businesses as are able to provide a service be qualified. I do not see how DOT & PF's acceptance of an otherwise perfectly proper written comment four days after the comment period closed suggests any bias or impropriety.
Tom Owens' affidavit describes the second incident. DOT & PF denies that the incident occurred as Owens describes, but because of the untimeliness of the presentation of the affidavit, neither DGG nor DOT & PF has had an opportunity to present a different version of what happened. Nonetheless, the court cites DOT & PF's reliance on the affidavit in concluding that there was a reasonable basis to cancel the solicitation. The question is not whether DOT & PF relied on the affidavit. If a fact-finder were to find that Owens either misunderstood what Humphries said, or misrepresented what Humphries said, and that Humphries did not suggest any bias against PW, then this becomes a non-issue. Certainly Owens' rationalization for not coming forward sooner suggests that he was biased; it was not until he learned to whom the contract was being awarded that he came forth. Given his wife's involvement in the duty-free business, his recollection may be questioned. This issue is foreclosed from consideration by this court's resolution of the case. Neither DGG's submission of written comments, nor Tom Owens' affidavit support PW's claim that the DOT & PF was biased against it.
Regarding the "appearance of impropriety," this case is distinguishable from both McBirney, supra, and Dick Fischer Dev. v. Department of Admin., 838 P.2d 263 (Alaska 1992). In McBirney there was actual, substantial impropriety (enough to lead to a grand jury investigation), while in Fischer there was an ex parte communication between Commissioner Rudd and Al Parrish, an agent of Fischer, about the project. Fischer, 838 P.2d at 267. It was disputed whether Parrish was an agent of Fischer at the time of the communication, but there was no dispute that a discussion did take place. Id. Thus, there was an opportunity for impropriety to occur. In the present case, no ex parte communication between DGG and DOT & PF has been shown. The only documented contact between DGG and DOT & PF was the written request to alter the bid specifications, a solicited request that was four days tardy. Had the request been timely, there is no evidence that the action taken in response to it was improper. I agree that actual impropriety need not be proven. However, I do not agree that the mere possibility that there could have been an impropriety is enough.
The present case is more akin to Kila, Inc. v. State, Dept. of Admin., 876 P.2d 1102 (Alaska 1994) than it is to McBirney or Fischer. In Kila, the unsuccessful bidder alleged "numerous ... improprieties and ... illegalities in the contracting process." Kila, 876 P.2d at 1109. The court found them all to be without merit. Id. at 1106-09. Faced with a similar litany of unsubstantiated allegations, the court today finds an appearance of impropriety, not by examining each allegation, but by "considering the circumstances and allegations in the aggregate." This, I suggest, makes the whole greater than the sum of the parts. For example, the court finds that Diane Barth's e-mail message "does not prove any faulty procedure," but nevertheless concludes, without explaining why, that the e-mail message "contributes to an appearance of impropriety when considered in conjunction with other circumstances regarding the bidding." Either the e-mail *1007 message evidences a "faulty procedure," and therefore implies impropriety, or it does not. The "when considered in conjunction with other circumstances" proviso is used enough by the court that one begins to wonder if there is any fire behind all the smoke. By effectively holding that even the possibility of the appearance of impropriety is enough to cancel a bid solicitation, the court carries the rule established in McBirney and Fischer to a new, and unwarranted, level.

III.
I view the issue of continuing costs arising from litigation as a makeweight argument. The costs of litigation continue. Indeed, the cancellation has generated litigation. If the cost of litigation justifies cancellation, then every bid solicitation that is contested in court may be cancelled by the government with impunity. DOT & PF has not provided any estimate of savings which might result from cancelling the bid solicitation. This is understandable; it probably cannot. I agree with PW that cancelling a bid solicitation because an aggrieved bidder used the bid protest procedures sets a poor precedent.

IV.
We have held that "in exchange for a bidder's investment of the time and resources involved in bid preparation, a government agency must be held to an implied promise to consider bids honestly and fairly." King, 633 P.2d at 263. When a government agency cancels a bid solicitation without a reasonable basis, it breaches this implied promise. Because the reasons advanced by DOT & PF for cancelling the bid are either irrelevant (ambiguity), unsupported by the record (impropriety), or insupportable as a matter of law (continuing costs of litigation), I would hold that there was no reasonable basis for its decision to cancel the bid.
NOTES
[1] We entered an order February 8, 1995, affirming the superior court's order. This opinion explains our reasons for that affirmance.
[2] The invitation to bid solicited oral and written comments on the bidding terms:

The Airport will consider any suggestion, comment, or request for additional information concerning the bid documents if presented at the March 15, 1994, prebid conference or submitted in writing [address given] by 1 p.m. Monday, March 21, 1994....
[3] Paul Wholesale B.V. and HOLS Trading, GmbH formed a joint venture to bid on the AIA duty-free concession. Paul Wholesale, B.V., a Dutch corporation, conducts duty-free business operations in Holland, Russia, and Germany. Paul Wholesale is a duty-free retailer and wholesaler, supplying products and services to large international companies. Hols Trading, GmbH, a German corporation, operates wholesale distribution and retail sale activities in more than four different countries.
[4] The third bidder has not appealed and is not a party to the proceeding.
[5] We lifted the stay February 8, 1995, when we issued our order affirming the superior court's September 26, 1994 order of dismissal.
[6] It is likely DOT & PF read our August 10 remand order to imply that we considered the language to be at least unclear. If the bid documents unequivocally required retail experience, there would have been no reason for us to remand for DOT & PF to make findings whether the bid documents required retail experience.
[7] Also, AIA rejected the supplemental information supplied by PW about its retail sales experience because it was from a "different business entity." PW challenged that rejection in the superior court and also raises it on appeal. Were there a rational basis for that rejection, the meaning of the bidder qualification provision would become critical. The dispute about its meaning would be not just relevant but dispositive.

DGG argues the bid competition was not affected by any ambiguity. Similarly, the dissent argues that DGG gained no competitive advantage over PW. Dissent at 1005. But if the specifications had clearly required retail duty-free experience, PW would have had an opportunity to find a joint venture partner that had the requisite experience. Considered in context of PW's vigorous claim that AIA favored DGG and disfavored PW, those arguments fail to demonstrate that DOT erred in citing ambiguity as one reason for cancellation.
[8] In Fischer, we discussed McBirney:

In McBirney, we held that a demonstrated impropriety justified cancellation of a contract between the State and McBirney & Associates. Id. at 1137. In reaching our conclusion, we cited NKF Engineering, Inc. v. United States, 805 F.2d 372 (D.C. Cir.1986). In NKF, the court noted that the appearance of impropriety was reason enough to disqualify a bidder. Id. at 376. The goal of the competitive bidding process is "to prevent fraud, collusion, favoritism and improvidence in the administration of public business." McBirney, 753 P.2d at 1135-36 (quoting Gostovich v. City of West Richland, 75 Wash.2d 583, 452 P.2d 737, 740 (1969)). Even the appearance of impropriety threatens the goals of the process and Fischer cannot legitimately claim that the ex parte communication did not create the appearance of impropriety. We hold, therefore, that the concern over impropriety in the bidding process was sufficient to support the State's decision to cancel the project.
Fischer, 838 P.2d at 267.
[9] PW argues that such a rule would allow low bidders to force cancellations by intentionally engaging in impropriety. Given PW's assertions that the State was receptive to DGG's allegedly improper acts, we need not consider whether the State could cancel a solicitation as a result of a lower bidder's impropriety which the State undisputably rebuffed.

Further, this case is unusual because, as the result of the protests and appeals, AIA awarded the contract to DGG and PW at different times. Generally, as was the situation in Fischer and McBirney, the highest bidder would receive the award and the unsuccessful bidders would challenge the award based on the successful bidder's alleged impropriety. In this case, it was PW, the highest bidder, which challenged not only the propriety of DGG's efforts, but the entire bid process including AIA's impartiality.
[10] Addendum No. 3 states in pertinent part:

In place of audited balance sheets, the bidder may submit limited review financial statements prepared by a certified public accountant and signed by both the certified public accountant and an authorized officer of the bidder for the two most recent calendar or bidder fiscal years. If the bidder submits limited review financial statements, the bidder must also submit copies of its U.S. tax returns for the two most recent calendar or bidder fiscal years.
[11] Diane Barth, the Chief of Leasing, sent an electronic mail message to Greg Brown, Leasing Officer, on May 17, stating:

I have just had a tele conversation with Lowell Humphrey. He had a discussion with John Horn, Helvi Sandvik, and Bruce Campbell this morning. Both Helvi and Bruce read the bid specs and concluded that it was possible to interpret the bidder qualifications to allow for a duty free wholesaler. It is also their position that it is much easier to defend a high bid than a second highest bid. I asked if that meant we were to rebid. Lowell said the decision was to award to the highest bidder.
We are to prepare something for John Horn's signature regarding this. Lowell also thought that we should issue an intent to award and allow for 5 days  he thought that was the fair thing to do. We are not to ask the Dept. of Law this one question.
[12] The Invitation to Bid also provided in pertinent part that the DOT & PF Central Region Director decides appeals:

To appeal the award, an aggrieved bidder must file a written appeal with the Alaska Department of Transportation and Public Facilities' Central Region Director within five days after the date of the notice of intent to award and send copies of the written appeal to all other bidders. If a timely appeal is filed, the Airport will not award the agreement until the Central Region Director issues a written response. At his discretion, the Central Region Director may hold a hearing to consider the aggrieved bidder's appeal.
(Emphasis added.)
[13] Owens' wife owns Artique, Ltd., which has operated in conjunction with the incumbent airport duty-free concessionaires for the last five years.
[14] DGG claims that the Owens' affidavit should be stricken because PW did not bring this information forward previously and if PW had raised this evidence earlier, DOT & PF would not have delegated the authority to Humphrey. Owens executed the affidavit August 22. PW filed it on August 23 as a supplement to PW's August 19 motion to vacate Humphrey's August 16 findings. Owens' affidavit explains that although Owens informed PW's counsel of the encounter with Humphrey "very early on in this litigation," Owens "refused to execute an affidavit, because of [his] wife's involvement with Duty Free Shoppers [the duty-free shop prior to this dispute] and her request that [he] not become involved in the dispute between the Pauls Group and the Green Group." Owens changed his mind after learning that AIA's response to the supreme court and superior court orders was to award the contact to DGG. Apart from whether PW might have used other means (such as taking Owens' deposition) to disclose this information sooner, the pertinent question is whether DOT & PF could properly take PW's assertions and the newly-revealed Owens' affidavit into account when deciding whether to cancel the solicitation. Because Commissioner Barton, in cancelling the solicitation, referred to the allegations of impropriety, and because those allegations were based in part on the Owens' affidavit, we find it appropriate to consider the existence of Owens' affidavit in deciding whether there was a reasonable basis for DOT & PF to find a possible appearance of impropriety.
[15] Normally we will refrain from deciding questions where events have rendered the legal issues moot. Brandon v. Department of Corrections, 865 P.2d 87, 92 n. 6 (Alaska 1993) (citing Hayes v. Charney, 693 P.2d 831, 834 (Alaska 1985)). However, "where the matter is one of public concern and is recurrent but is capable of evading review," there is a public interest exception to the mootness doctrine. Hayes, 693 P.2d at 834 (quoting Doe v. State, 487 P.2d 47, 53 (Alaska 1971)). The remaining issues are not of that character.
[1] That PW and DGG may still dispute whether PW had the requisite retail experience to comply with the bid solicitation requirements does not mean that the retail experience clause is ambiguous, but merely that the parties disagree about the application of that clause to the particular facts of this case.
[2] The court refers to the PW memorandum "chronologically discussing events PW argued supported its claim that AIA was biased against PW and for DGG," but wisely does not rely on the allegations contained in this memorandum to support its conclusion that there was a reasonable basis for DOT & PF to cancel the bid solicitation. The allegations are wholly unsubstantiated, often irrelevant, and largely do not, even if proven, suggest impropriety or impermissible activity. To cite but one example, PW alleged as a distinct incident of bias that "AIA purposely or negligently ignored that Bruce Davison was [PW's] designated contact person when it contacted Mr. van der Kolk." PW does not explain how it was prejudiced by this alleged mistake, or how the allegation, even if true, indicates bias against it.