Sammy D. BAKER, Jeffry C. Baker, and
Alvin C. Tomlinson, Appellants,

v.

STATE of Alaska, Appellee.

No. A–4917.

Court of Appeals of Alaska.

Aug. 5, 1994.

Arthur S. Robinson, Robinson, Beiswenger, & Ehrhardt, Soldotna, for appellants.

Robert Nauheim, Asst. Dist. Atty., Sharon A.S. Illsley, Dist. Atty., Kenai, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before COATS and MANNHEIMER, JJ., and WOLVERTON, District Court Judge.[*]

*OPINION*

MANNHEIMER, Judge.

Sammy D. Baker is the holder of a Commercial Fisheries Entry Commission (CFEC) permit. He operates the fishing vessel "Sea Ducer II". Under 5 AAC 39.107(b), "[t]hroughout the period of operation of mobile net gear, a person who holds a valid CFEC permit for that gear must be physically present on board the vessel from which the net gear is operated." Under section (c)

of the same regulation, the permit-holder "shall personally operate or assist [or immediately supervise] the operation of mobile net gear".

On August 2, 1992, while Baker was absent from his vessel, Jeffry C. Baker (Sammy Baker's 16–year–old son) and Alvin C. Tomlinson operated the vessel for commercial fishing. When Alaska State Trooper Todd Sharp boarded the vessel, Jeffry Baker and Tomlinson concealed the fact that the permit-holder (Sammy Baker) was not on board. Tomlinson told the trooper that he was Sammy Baker; he produced the ship's registration documents and Sammy Baker's CFEC permit, which he claimed was his own. When the trooper asked Tomlinson for personal identification, Tomlinson said that he had left his identification on shore. Upon further questioning, Tomlinson admitted his true identity and confessed that Sammy Baker was not present on the boat.

At a later evidentiary hearing, Sammy Baker testified that he had left the fishing vessel to return to his job as production foreman for Atlantic Richfield. Baker allowed his son Jeffry and Tomlinson to operate the boat because he considered each of them to be just as capable a fisher as himself, and because he felt that he owed them the opportunity to fish for a whole season while he returned to his oil field job. Baker stated that when his son and Tomlinson operated the boat without him, he let them keep the entire proceeds of their catch. When asked why he had not transferred his permit to his son Jeffry, the elder Baker answered that he believed Jeffry, at age sixteen, was not sufficiently experienced to assume full responsibility for the fishing operation. However, Sammy Baker had left his son in charge of the boat so that Jeffry could gain experience running the operation.

Sammy Baker pleaded no contest to violating 5 AAC 39.107(b), being absent from the fishing vessel that operated the mobile net gear for which he had the permit. Jeffry Baker pleaded no contest to violating AS 16.43.140(a), operating commercial fishing

[*] Sitting by assignment of the chief justice made pursuant to Article IV, Section 16 of the Alaska Constitution.

gear without a permit. Tomlinson pleaded no contest to violating 5 AAC 39.197, possessing unlawfully taken fish. When they entered these pleas, the defendants reserved the right to challenge the constitutionality of 5 AAC 39.107(b), the regulation requiring the permit-holder to be present when commercial fishing gear is operated. *See Cooksey v. State,* 524 P.2d 1251 (Alaska 1974).

The defendants argue that 5 AAC 39.107(b) violates the equal protection clause of the Alaska Constitution (Art. I, § 1) as well as the clause in Art. VIII, § 17 that requires all "regulations governing the use or disposal of natural resources [to] apply equally to all persons similarly situated with reference to the subject matter and purpose to be served by the ... regulation". We conclude that 5 AAC 39.107(b) is constitutional, and we therefore affirm the defendants' convictions.

■ When determining whether legislation comports with the equal protection clause of the Alaska Constitution, we employ a "sliding" test that examines three factors: the importance of the legislative purpose(s) protected or fostered by the legislation, the importance of the individual interests adversely affected by the legislation, and the means chosen by the legislature to accomplish its purpose(s).

We first determine the importance of the individual interest impaired by the challenged enactment. We then examine the importance of the state interest underlying the enactment, that is, the purpose of the enactment. Depending upon the importance of the individual interest, the equal protection clause requires that the state's interest fall somewhere on a continuum from mere legitimacy to a compelling interest. Finally, we examine the nexus between the state interest and the [enactment's] means of furthering that interest. Again depending upon the importance of the individual interest, the equal protection clause requires that the nexus fall some-

where on a continuum from substantial relationship to least restrictive means.

*State v. Enserch Alaska Construction, Inc.,* 787 P.2d 624, 631–32 (Alaska 1989) (footnote omitted).

■ In *Gilbert v. Department of Fish & Game,* 803 P.2d 391, 398 (Alaska 1990), the supreme court stated that a challenge to legislation under the "uniform application" provision of Article VIII, Section 17 "may invoke more stringent review ... than standard equal protection [review] under article I, section 1". The supreme court has also stated:

In reviewing legislation which burdens the equal access clauses of article VIII, the purpose of the burden must be at least important [and the] means used to accomplish the purpose must be designed for the least possible infringement on article VIII's open access values.

*McDowell v. State,* 785 P.2d 1, 10 (Alaska 1989).

■ The supreme court's pronouncements on Article VIII might be interpreted to create a distinct constitutional analysis for challenges based on the uniform application clause. However, we think it is noteworthy that, in *McDowell,* the court tracked the equal protection test, speaking of the importance of the legislative purpose and the means used to accomplish it. It appears that, when the supreme court analyzes legislation under Article VIII, the court uses the same approach employed in its equal protection cases, but, in recognition of the high importance of citizens' equal access to natural resources, the court requires the government to demonstrate both an "important" legislative purpose and means narrowly tailored to accomplish that purpose.[1] This analysis comports with the court's statements that legislation "impairing the important right to engage in economic endeavor" must be supported by a legislative purpose that is

---

1. Since *McDowell,* the court has continued to use equal protection language in Article VIII cases. See *Gilbert,* 803 P.2d at 399, in which the court upheld different harvest quotas for different fisheries because fishers in different fisheries were not "similarly situated" and because the quotas reasonably furthered resource conservation.

Similarly, in *Alaska Fish Spotters Assn. v. State,* 838 P.2d 798, 803–04 (Alaska 1992), the court summarily rejected a claim that a ban on fish spotting violated the uniform access clause, stating that the clause was not violated because "the regulation applied equally to all citizens".

"not only legitimate, but important", and that "the nexus between the enactment and the ... interest it serves [must] be close". *Ensearch Alaska Construction,* 787 P.2d at 633. *See also Commercial Fisheries Entry Comm'n v. Apokedak,* 606 P.2d 1255, 1266 & nn. 45–46 (Alaska 1980) (the right to engage in commercial fishing is "important").

▮ Both the supreme court and this court have recognized that preservation of economic benefit and conservation of a natural resource are two important goals underlying the legislature's regulation of commercial fishing. Thus, the legislature is generally authorized to strictly regulate commercial fishing. *Apokedak,* 606 P.2d at 1265; *State v. Martushev,* 846 P.2d 144, 145, 150 (Alaska App.1993). The defendants in this case do not question the legislature's interest in regulating their industry. Instead, the defendants assert that these legislative interests are not significantly advanced by the requirement that the permit-holder be present on the fishing boat.

▮ The defendants argue, in essence, that the State may have an interest in enforcing a permit system that limits the number of people who engage in commercial fishing, but so long as the number of boats taking fish does not exceed the number of permits, there is no difference (as far as the State's interests are concerned) whether a fishing boat is being operated by the permit-holder or by someone else. We conclude, however, that important governmental interests are advanced by requiring the permit-holder's personal presence on board the fishing vessel.

A major benefit of requiring the permit-holder's personal presence was addressed in *State v. Ostrosky,* 667 P.2d 1184 (Alaska 1983). In *Ostrosky,* the supreme court confronted an equal protection challenge to AS 16.43.170(b), the statute governing transfer and inheritance of commercial fishing permits. One of the arguments accepted by the supreme court in favor of the statute was that, by making the permits sellable, the legislature encouraged permit-holders to act in ways that would increase the value of their permits. Because the sale price of these permits would "depend[ ] largely on the state

of the fishery", permit-holders wishing to preserve or enhance their investment would be encouraged to "obey conservation laws, assist in the apprehension of violators of those laws, and willingly contribute to aquaculture programs". *Ostrosky,* 667 P.2d at 1194–95.

The regulation requiring permit-holders to be present on the vessel appears calculated to achieve these same ends. The regulation prevents permit-holders from establishing themselves as "absentee landlords" who would rent their permits to the fishing equivalent of "sharecroppers". Without the requirement of personal presence, permit-holders would be tempted to take year-round, nonfishing jobs and supplement their income with the rent paid by fishing crews for the use of their permits. As for the crew doing the actual fishing, their interest would lie in making the most money they could in a season, so that their after-rent profit would be higher. The crew would have no long-term interest in the health of the fishery resource; they would fish with the knowledge that the permit-holder might choose to rent the permit to another, higher-bidding crew next time.

If permit-holders were allowed to remain on shore, renting their permits, the specter would be raised of consortiums or partnerships becoming the renters of the majority of fishing permits; these businesses would, in turn, sublet the permits to actual fishing crews. Under such an arrangement, these permit "wholesalers" might become the dominant power in the fishing industry.

Even if the permit-holder and crew did not enter a landlord-tenant relationship, the danger to the fishery would still exist. The facts of the present case illustrate the potential problem. Sammy Baker testified that when Jeffry Baker and Alvin Tomlinson fished without him, he allowed them to take the whole proceeds of the catch. Under this arrangement, economic forces might encourage Tomlinson and the younger Baker to take advantage of their limited opportunity for higher profit by adhering less strictly to conservation and gear limitation regulations.

■ We therefore conclude that requiring the permit-holder to be personally present furthers important governmental interests. The defendants nevertheless argue that these governmental interests do not outweigh the permit-holder's "right to engage in economic endeavor" and the "right of access to natural resources" established by Article VIII, Section 17. We do not perceive that requiring the permit-holder to be personally present during fishing operations substantially impairs the permit-holder's right to engage in commercial fishing or right of access to the fishery. The regulation does impair the permit-holder's ability to take another job and let someone else use the permit to fish. However, the permit-holder has only a minimal interest (if any) in being able to rent or loan his or her permit to others outside the perimeters of existing law. We note that, under 20 AAC 05.1740, emergency transfers of a CFEC permit are allowed when unforeseen emergency or hardship prevents the permit-holder from fishing.

■ The defendants raise an additional challenge to 5 AAC 39.107. They assert that it unconstitutionally differentiates between permit-holders who are licensed to use mobile fishing gear and permit-holders licensed to use stationary fishing gear. As noted above, 5 AAC 39.107(b) and (c) require permit-holders of .mobile gear to be physically present during the operation of the gear and to personally participate in the operation. The next two sections of the regulation, 5 AAC 39.107(d) and (e), govern permit-holders for stationary gear. Under 107(d)–(e), permit-holders licensed to use stationary gear generally must also be present during operation of the gear. However, 107(d)–(e) makes two exceptions to this rule: stationary gear permit-holders may leave the site of operation to sell the fish they have caught in the gear or to travel to the site of any other stationary gear they are licensed to operate, as long as they stay "within a reasonable distance" of all their gear to insure their continuing "competent supervision of the gear".

The defendants assert that this regulation unjustifiably grants the users of stationary gear greater rights than the users of mobile gear. The State responds that the regulation lawfully distinguishes between mobile gear and stationary gear because the operators of mobile gear are not "similarly situated" to operators of stationary gear. We agree. Fish purchasers do not ordinarily visit set net sites. If stationary gear operators were not allowed to leave the immediate site of the gear to sell their catch, they would have to cease fishing in order to sell their catch. The defendants respond that drift net fishers must also cease fishing to sell their catch. However, stopping the operation of a drift net is a much different task from dismantling a set net. The Board of Fisheries could rationally conclude that permit-holders for these two different types of gear should be treated differently. *See Meier v. State Board of Fisheries,* 739 P.2d 172 (Alaska 1987) (upholding a 48–hour waiting period for fishers transferring from one district to another against the argument that the waiting period unfairly favored set net operators over drift net operators), and *State v. Reefer King Co.,* 559 P.2d 56, 65–66 (Alaska 1976) (upholding differential treatment of floating fish processors and shore-based fish processors), *modified on other grounds on rehearing* 562 P.2d 702 (Alaska 1977).

■ The defendants also attack two other portions of 5 AAC 39.107. Sections (f) and (g) of that regulation make special provision for stationary gear permit-holders in the Yukon and Yakutat districts:

(f) In the Yukon area . . ., a person who holds a CFEC permit for stationary fishing gear must be present for the initial deployment of the gear at the beginning of the commercial fishing period and at the end of the commercial fishing period to terminate operation of the gear.

(g) In the Yakutat district south of 59 [degrees] 40 [minutes] [North latitude] in Yakutat Bay, a fishing site under AS 16.-05.253(b) includes the CFEC permit holder's permanent place of residence in Yakutat.

The defendants argue these sections unjustifiably give greater freedom to stationary gear operators in the two districts.

As the State points out in its brief, section (f) appears to strengthen, not relax, the requirement of the permit-holder's presence: even in circumstances when sections (d) and (e) might allow the permit-holder to be absent from the immediate site of the gear, the permit-holder must nevertheless be present at the immediate site of stationary gear for the opening and closing of each commercial fishing period.

As to section (g), the State asserts that this section

> merely recognizes the fact that the village of Yakutat is geographically ... adjacent to the sites at which fishing operations are conducted in the portion of the district covered by the regulation. Set net fishermen at this location have not ordinarily constructed additional shelters or cabins[,] since the village is so close to the actual fishing sites[.] [C]lose supervision of gear and the accountability of permit holders can be accomplished by allowing permittees to monitor their gear from their residence[s] in Yakutat.

The State's explanation of section (g), which is unrebutted by the defendants, provides a rational basis for the distinction drawn in that section among stationary gear operators.

For these reasons, we reject the defendants' constitutional challenges to 5 AAC 39.-107. We conclude that this regulation violates neither the equal protection clause of Article I, Section 1 nor the uniform application clause of Article VIII, Section 17.

The judgements of the district court are AFFIRMED.