Clyde BAXLEY, individually, and on behalf of the citizens of the State of Alaska, and The Republican Moderate Party, a political group, on behalf of the citizens of the State of Alaska, Appellants,

v.

STATE of Alaska, and John Shively, Commissioner, Department of Natural Resources, and BP Exploration (Alaska), Inc., Appellees.

No. S–8155.

Supreme Court of Alaska.

May 15, 1998.

Jody Patrick Brion, Leutwyler, Brion & Associates, Anchorage, for Appellants.

Lawrence Z. Ostrovsky, Jeffrey D. Landry, Camille Oechsli, Assistant Attorneys General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellees, State of Alaska and John Shively.

Jeffrey M. Feldman and Susan Orlansky, Young & Feldman, Anchorage, and Alan L. Sullivan, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, for Appellee BP Exploration (Alaska), Inc.

John E. Havelock, Ely & Havelock, Anchorage, for Amicus Curiae Oilwatch, Alaska, Inc.

Before MATTHEWS, C.J., and COMPTON, EASTAUGH, FABE, and BRYNER, JJ.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

Citizen-taxpayers filed suit challenging a legislative enactment approving and giving effect to modifications of four State oil and gas leases in the Northstar Oil Field. Reasoning that the modifications were a narrowly tailored response to a unique situation, and that the legislature had not given the lessee preferential treatment, the superior court granted summary judgment for the defen-

dants. Because we agree with that analysis, we affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

The Northstar Unit is an oil field in the Beaufort Sea, approximately six miles from Prudhoe Bay. It contains tracts of land now subject to five State and two federal oil and gas leases. In 1979 Amerada Hess submitted the winning bid in a sale of four of the State's leases. They are the subject of this litigation.

The four leases were unusual, partially because, the "net profit share" was the. bid variable for the 1979 auction. When the State sells oil and gas leases, the Commissioner of the Alaska Department of Natural Resources (DNR) analyzes the tracts of state land to be leased and determines, in advance of the sale, which lease terms to establish as fixed or variable. AS 38.05.180(f)(1), (3); *Hammond v. North Slope Borough*, 645 P.2d 750, 763–64 (Alaska1982). The Commissioner determines which bidding· method (the combination .of fixed and variable lease terms) is in the state's best interest. AS 38.05.180(f)(1); *see also Hammond*, 645 P.2d at 763–64 (discussing some of the factors the Commissioner considers when selecting bidding methods); *Kelly v. Zamarello*, 486 P.2d 906, 912–13 (Alaska 1971). Typically, the bid variable is the bonus, the royalty share, the net profit share, or some combination of those terms. AS 38.05.180(f)(3)(A)-(G).

█ A royalty is "a share of the product or profit reserved by the owner of land for permitting another to develop his land for oil or gas." Earl A. Brown, *The Law of Oil and Gas Leases* § 6.00 (1967). Royalties are usually expressed as fractions (such as a royalty of one-eighth of production), and they usually continue throughout the life of the lease, whether the lessee reaps a net profit or not. *Kelly*, 486 P.2d at 913 (citing *Griffith v. Taylor*, 156 Tex. 1, 291 S.W.2d 673,. 676 (1956)); *see also* Richard W. Hemingway,

*The Law of Oil and Gas* § 2.5, at 57–58 (3d ed.1991). A bonus is· a definite sum (not a fraction of production), to be paid in cash or out of production, for the execution of the lease. *Kelly*, 486 P.2d at 913; Hemingway, *The Law of Oil and Gas* § 2.4, at 56.

█ A net profit share (NPS), like a royalty, is a percentage of the lessee's production. 5 Eugene Kuntz, *A Treatise on the Law of Oil and Gas* § 63.5, at 254 (1991) [hereinafter Kuntz]. The lessor, however, only collects on the NPS interest when the lessee's operations yield a profit, after the lessee has recouped its expenditures for exploration and development. 11 Alaska . Administrative Code (AAC) 83.207–219; *see also* Kuntz § 63.5, at 254. The Alaska Administrative Code allows lessees to establish special development accounts to recover. all of their development costs before any NPS payments become due to the State. 11 AAC 83.207–214.

The State and BP Exploration (Alaska), Inc. argue that NPS terms allow the lessor to reap the benefits of rising oil prices in the future, especially if the lessee finds cost-effective ways of· developing the field and extracting the oil. According to the State and BP (collectively, the State), leases with high NPS terms are the most risky for the lessor, because the lessor will receive little or nothing if the field is unprofitable, or if the lessee develops the field in an inefficient manner. *See, e.g.,* Kuntz § 63.5, at 258 ("[T]he owner of the [net profit] interest is dependent upon the activity of the lessee to generate net profits.").

During a brief period in the late 1970s, some lessors experimented with NPS terms, which were, and still are, controversial.[1] The State notes that some observers theorize that leases·with high NPS terms have a fundamental problem: under these leases, the lessors' and lessees' interests are misaligned because "the oil company [has] no incentive to develop the leases promptly or to economize costs during the development." Furthermore, lessees receive very little income after the NPS payments begin; for instance,

1. Philip E. Sorenson, then-visiting Professor of Economics at the University of California, Santa Barbara, addressed the Alaska House of Representatives in 1979, prior to the. Beaufort Sea lease sale. He analyzed NPS interests in detail and urged the legislature not to use NPS as the bid variable in the Northstar auction.

according to the State, the Northstar lessee was predicted to receive a profit of less than fifty cents per barrel once the NPS payments began. When the lessee begins paying a large percentage of its profits to the State, along with taxes and royalties, it has very little incentive to operate efficiently. The lessee also may be tempted to discontinue its operations and abandon the field prematurely, because it retains only a small portion of the profits after it has recouped its development costs.

In the late 1970s, however, oil prices had been rising, and experts predicted that they would climb to $60 to $100 per barrel. In addition, research indicated that the Northstar Unit contained massive reserves of oil—perhaps up to one billion barrels.[2] Thus, in 1979 the State chose to auction four of its Northstar lease tracts using NPS as the bid variable.

The four leases auctioned in 1979 had a fixed cash bonus and a fixed royalty of 20%.[3] Amerada Hess submitted the winning bids, with NPS terms ranging from 85.26% to 93.2%.[4] The winning NPS figure averaged about 89%, meaning that after the leaseholder recovered its expenses, the State would receive 89% of the profits.

According to the State, from 1979 to 1994 Amerada Hess invested approximately $260 million in attempting to develop the Northstar Unit. Because of the NPS terms (which allowed the lessee to recoup all of its development costs before beginning to make net profit share payments to the State), the State's chances of receiving the NPS payments seemed increasingly slim, as Amerada Hess invested in development with little prospect of producing. A 1993 study by the

federal Department of Energy concluded that "Northstar was uneconomic largely due to the net profit provision." Amerada Hess estimated that its development costs would approach $1.4 billion. The combination of the development costs, the 89% NPS, and the fact that optimistic projections of Northstar's reserves and world oil prices had not materialized convinced Amerada Hess to abandon its plans to develop its Northstar holdings. Amerada Hess did not submit a required development plan to the State, and DNR issued a notice of default to Amerada Hess in November 1994.

Instead of curing the default, Amerada Hess sold its interest in the leases to BP in 1995.[5] The State was not involved in the sale negotiations, nor were the terms or prices disclosed to the public.[6] BP submitted a brief plan of development to DNR, which extended the time for submitting a more detailed plan. In March 1995 BP submitted, and DNR approved, a revised and more comprehensive three-year development plan.[7] The revised plan increased the development time from two years to three years. Under this plan, production would probably not begin until 2002.

Both DNR and BP asserted that BP's development of the Northstar leases would be profitable under the original lease terms. BP, however, has estimated that its rate of return later in the life of the field would be 21% without the NPS lease terms, and only 10% with the NPS terms. According to an Arthur D. Little Co. report cited in findings of fact issued by the Senate Resources Committee, oil companies tend to look for rates of return around 15%. In early 1995 BP inti-

---

2. In 1996 the Commissioner stated that the Northstar Unit's reserves were estimated to contain 130 million barrels. The State's Brief of Appellee, filed in 1997, asserts that oil prices had settled around $18 per barrel.

3. The State auctioned its fifth Northstar lease in 1983, using a bonus as the variable term, a fixed royalty of 12.5%, and a fixed NPS of 40%.

4. Amerada Hess had the largest, but not the only, share of the four Northstar leases. The other original lessees were Shell Oil Co., Enterprise Oil Co., and Murphy Oil Co. Amerada Hess bought Enterprise's interest for $2 million in 1990.

5. Shell also sold its interests to BP.

6. Oil and gas lessees often sell interests in leases without the State's involvement; the State may, however, be required to approve assignments resulting from the sale.

7. The plan called for data gathering, 3–D seismic acquisition, and construction permit acquisition. The projected three-year cost of these steps was $12 million.

mated to DNR that it hoped to revise the NPS terms. BP and DNR, however, decided not to pursue that issue at that time.

Later that year, BP's president testified that

with the net profit arrangement in place, at the level that it exists, BP would not be prepared to go ahead with the development of a Northstar project, even though, if you run the economics, you can show that the return on investment for the project is a sound sort of return on investment.

BP made this announcement after DNR had approved the plan of development (which included a three-year period in which very little development would occur).[8]

DNR's Petroleum Investment Manager stated that, to his knowledge, this was the first time that a lessee had ever informed the State "that it would be economical to produce a field, but that it is unwilling to do so unless the State renegotiates its competitively bid terms."[9]

In the fall of 1995, after BP's announcement, DNR and BP conducted confidential negotiations regarding possible amendments to the leases. The negotiations yielded the following proposed amendments: the State's NPS (which had averaged 89%) would be eliminated; the State's royalties would be at least 20% for all of the leases, and a variable "supplemental royalty" of 7.5% could be added to that; a "use it or lose it" provision

would be added, allowing the State to terminate the leases (without litigation) if BP did not begin development within a certain period; and BP committed to employing Alaskans in the construction and operation of its facilities.

The Commissioner has the statutory authority to make changes to royalty provisions of oil and gas leases without obtaining the legislature's approval. AS 38.05.180(j).[10] But the statute is silent on whether the Commissioner may amend NPS provisions. The Commissioner therefore negotiated proposed terms with BP and presented the negotiated proposed lease amendments to the Alaska legislature for consideration. The lease amendments were to take effect only upon approval by the legislature. After investigation by committees in the House and Senate, and testimony from DNR, BP, and the public, a bill for an act authorizing amendment of the Northstar Unit leases (the Act) passed both houses in May 1996. Governor Knowles signed the bill into law in July 1996. Since then, BP has approved development of the tracts covered by the leases.

## B. *Proceedings*

This case began in January 1997 when Clyde Baxley and the Republican Moderate Party brought a declaratory judgment action against the State and John Shively, Commissioner of the Department of Natural Resources.[11] Baxley and the Party (collectively

---

8. All of the State's oil and gas leases contain an implied covenant for lessees "to diligently explore and develop their leases." BP, however, could probably fulfill that obligation by meeting the requirements of its DNR-approved three-year plan.

9. The lease between Amerada Hess and the State allowed assignment and conveyance, but required the new lessee to be bound by all of the terms of the original lease. The lease provides, in part:

This lease, or any undivided interest herein, may, with the approval of the State, be assigned, subleased or otherwise transferred.... No assignment, sublease or other transfer of an interest in this lease, including assignments of working or royalty interests and operating agreements and subleases, shall be binding upon the State unless approved by the State.... All covenants, conditions and agreements contained in this lease shall extend to

and be binding upon the heirs, administrators, successors, and assigns of the State and/or Lessee.

10. AS 38.05.180(j) provides, in part:

The commissioner
(1) may provide for an increase or decrease or otherwise modify royalty, to allow for production that would not otherwise be economically feasible, on individual leases....
(2) may not grant a royalty modification unless the lessee or lessees requesting the modification make a clear and convincing showing that a modification of royalty meets the requirements of this subsection and is in the best interests of the state....

11. The Republican Moderate Party claims to be a nonprofit political group. The Republican Party of Alaska asserted below that the Republican Moderate Party admits it is not a political party,

Baxley) asserted that they had citizen-taxpayer standing to challenge the Act. Baxley argued that the Act violates the Uniform Application Clause and the Public Notice Clause of the Alaska Constitution, and that it violates competitive bidding statutes and laws proscribing material amendments to competitively bid contracts.[12] Baxley also contended that the Commissioner lacked the authority to modify the leases. BP intervened as a party defendant under Alaska Rule of Civil Procedure 24.

The State moved to dismiss for lack of standing. Both sides then filed motions for summary judgment. The superior court found that all plaintiffs had standing as citizen-taxpayers. It denied Baxley's motion for summary judgment and granted the State's motion for summary judgment. The court concluded that the rule against material amendments did not apply to amendments by the legislature. The court also reasoned that the legislature had conducted adequate public hearings, had not given BP privileged status, and, in passing the Act, had created a narrowly tailored response to a unique problem. Baxley appeals.

## III. DISCUSSION

### A. Standard of Review

We review a grant of summary judgment with our independent judgment. *Reeves v. Alyeska Pipeline Serv. Co.*, 926 P.2d 1130, 1134 (Alaska 1996). We will affirm a grant of summary judgment if the evidence in the record, viewed in the light most favorable to the non-moving party, fails to disclose a genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Metcalfe Inv., Inc. v. Garrison*, 919 P.2d 1356, 1360 (Alaska 1996).

■ A party raising a constitutional challenge to a statute bears the burden of dem-

onstrating the constitutional violation. A presumption of constitutionality applies, and doubts are resolved in favor of constitutionality. *A. Fred Miller, Attorneys at Law, P.C. v. Purvis*, 921 P.2d 610, 618 (Alaska 1996); *Bonjour v. Bonjour*, 592 P.2d 1233, 1237 (Alaska 1979).

### B. Standing

■ Following vigorous debate on the issue, the superior court held that Baxley had standing as a citizen-taxpayer to present the issues raised in his complaint. The State suggests on appeal that we may resolve Baxley's Uniform Application Clause claim "on standing grounds, without reaching the merits."

■ We decline to disturb the superior court's finding that Baxley has standing as a citizen-taxpayer.[13] A plaintiff must meet two requirements in order to establish citizen-taxpayer standing. First, the case "must be one of public significance." *Trustees for Alaska v. State*, 736 P.2d 324, 329–30 (Alaska 1987). A plaintiff who raises constitutional issues is likely to meet this requirement. *Id.* Second, the plaintiff must be an "appropriate" party to bring the case. *Id.* Appropriateness has three main facets: the plaintiff must not be a "sham plaintiff" with no true adversity of interest; he or she must be capable of competently advocating his or her position; and he or she may still be denied standing if "there is a plaintiff more directly affected by the challenged conduct in question who has or is likely to bring suit." *Id.* The citizen-taxpayer standing requirements ensure that the plaintiff will serve as a true and strong adversary, even if the conduct in question did not directly affect the plaintiff.

■ Baxley argues that the Act violates constitutional provisions, may reduce the State's income, undermines public confidence in the integrity of the bidding system, and

and that it has no relation to the Republican Party of Alaska. The Republican Party of Alaska has disclaimed interest in this case.

12. Baxley also asserted, but later withdrew, a claim that the Act violated the Privileges and Immunities Clauses of the Alaska and United States Constitutions, and the Commerce Clause of the United States Constitution.

13. We review de novo a finding of standing. *Earth Movers of Fairbanks, Inc. v. Fairbanks N. Star Borough*, 865 P.2d 741, 742 n. 5 (Alaska 1993) (citing *Langdon v. Champion*, 745 P.2d 1371, 1372 n. 2 (Alaska 1987)).

violates the public trust. Those issues have public significance.[14] The State asserted below that Baxley is not an appropriate plaintiff; it suggested that a competing oil company, for instance, would have been a more appropriate challenger. The mere possibility that another party might sue, however, does not necessarily justify a denial of standing. *See Trustees,* 736 P.2d at 330. Baxley's interests are sufficiently adverse to those of the State and BP. He is adequately represented and can advocate his position competently. We conclude that the superior court did not err in determining that Baxley has citizen-taxpayer standing.

### C. The Uniform Application Clause

■ Baxley contends that the Act violates the Uniform Application Clause of the Alaska Constitution. That clause provides, "Laws and regulations governing the use or disposal of natural resources shall apply equally to all persons similarly situated with reference to the subject matter and purpose to be served by the law or regulation." Alaska Const. art. VIII, § 17.

■ In recognition of the importance of citizens' equal access to natural resources, we interpret the Uniform Application Clause to require legislation dealing with natural resources to satisfy a heightened level of equal protection scrutiny. *Gilbert v. State,* 803 P.2d 391, 398 (Alaska 1990); *Baker v. State,* 878 P.2d 642, 644 (Alaska App.1994).

■ The protections of the Uniform Application Clause, however, extend only to persons similarly situated with respect to the

subject matter and purpose of the legislation. Alaska Const. art. VIII, § 17; *Reichmann v. State,* 917 P.2d 1197, 1200 (Alaska 1996). "Concluding that two classes are not similarly situated necessarily implies that the different legal treatment of the two classes is justified by the differences between the two classes." *Shepherd v. State,* 897 P.2d 33, 44 n. 12 (Alaska 1995).[15]

The superior court held that the Uniform Application Clause does not apply because it found that BP's status as sole lessee of the Northstar leases rendered it uniquely situated with respect to the Act.[16] The superior court also held that, even if the Uniform Application Clause did apply, the Act would satisfy the clause's equal protection requirements.

We agree that the Uniform Application Clause does not apply. Land use statutes, for instance, sometimes favor existing land users over others. *See, e.g.,* AS 38.05.035(b)(5), .035(f). We also allow some changes to existing lessees' competitively bid contracts without requiring new public auctions. *See KILA, Inc. v. State,* 876 P.2d 1102, 1108–09 (Alaska 1994) (upholding State's decision to negotiate with successful bidder and accept a substitute site for government building); *Kenai Lumber Co. v. LeResche,* 646 P.2d 215, 218–22 (Alaska 1982) (allowing nonmaterial modifications to a long-term timber contract).

Not all persons in the state with an interest in a resource are similarly situated for purposes of the Uniform Application Clause.[17] BP, as sole lessee of the Northstar

---

**14.** *See, e.g., Trustees for Alaska v. State,* 736 P.2d 324, 330 (Alaska 1987) (granting citizen-taxpayer standing to a coalition of environmental, Native, and fishing groups challenging the States's mineral leasing system); *State v. Lewis,* 559 P.2d 630, 634–36 (Alaska 1977) (granting citizen-taxpayer standing for challenge of a three-way land trade involving the State, the federal government, and a Native corporation).

**15.** The State argues that no other entity is similarly situated with respect to the Act.

Baxley argues that similarly situated persons disadvantaged by the Act include: "1) all original bidders on Northstar; 2) all possible bidders at a potential rebidding of Northstar; 3) all potential bidders who might wish to bid for the rights given to BP ... and 4) all citizen-taxpayers of the

State of Alaska, who have a personal and individual stake in the fair allocation of Alaska resources."

**16.** We apply our independent judgment to the question whether BP is uniquely situated with respect to the Act. *See Luedtke v. Nabors Alaska Drilling, Inc.,* 834 P.2d 1220, 1223 (Alaska 1992) (noting that we review a trial court's application of law to facts with our independent judgment).

**17.** *See, e.g., Reichmann v. State,* 917 P.2d 1197, 1200 (Alaska 1996) (upholding differential treatment of residential and recreational users of lakeshore land); *Shepherd v. State,* 897 P.2d 33, 43–44 (Alaska 1995) (upholding Alaska Board of Game regulations giving hunting preference to

leases, is uniquely situated with respect to the Act. Because no other entity is similarly situated, we hold that the Act does not violate the Uniform Application Clause.

### D. *Special Legislation*

■ Baxley next argues that the Act was special legislation prohibited by article II, section 19 of the Alaska Constitution. Although we ordinarily do not consider on appeal issues not presented to the lower court,[18] we choose to address Baxley's special legislation argument. It does not depend on new facts, and it could have been gleaned from the pleadings because it is closely related to Baxley's Uniform Application Clause argument that the State gave BP privileged status. The issue therefore satisfies the requirements of *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985) (discussing bases for reaching appellate issues not preserved in lower court). Moreover, the State has not suggested that it has been prejudiced by introduction of this argument on appeal; on the contrary, it has conceded that the court may properly consider this issue.

■ The Alaska Constitution states: "The legislature shall pass no local or special act if a general act can be made applicable. Whether a general act can be made applicable shall be subject to judicial determination." Alaska Const. art. II, § 19. We evaluate challenges under this provision according to the test applied to nonsuspect classifications in equal protection cases.[19] *State v. Lewis*, 559 P.2d 630, 643 (Alaska

1977) (upholding a threeway exchange of land, and the minerals it contained, among the State of Alaska, the United States, and a regional Native corporation); *Boucher v. Engstrom*, 528 P.2d 456, 463 (Alaska 1974) ("The classification must bear a reasonable and proper relationship to the purposes of the act and the problem sought to be remedied."). Thus, when the legislature has singled out an area or group, we examine the

> legislative goals and the means used to advance them [to] determine whether the legislation bears a "fair and substantial relationship" to legitimate purposes. If this standard is satisfied, the bill will not be invalid because of incidental local or private advantages. Legislation need not operate evenly in all parts of the state to avoid being classified as local or special.

*Lewis*, 559 P.2d at 643 (footnotes omitted). This is the "minimum level of equal protection scrutiny in Alaska"; it is more demanding than its federal counterpart. *Principal Mut. Life Ins. v. State*, 780 P.2d 1023, 1026 (Alaska 1989).

■ The State argues that the Act is not local or special legislation because it "addresses a matter of statewide concern," and that, even though the Act focuses on one locality, it is constitutional because the high NPS terms made these leases unique and made general legislation inappropriate.

We conclude that the Act is not special legislation. Several features of the Northstar leases distinguish them from the State's other oil and gas leases. The Northstar

---

residents over nonresidents); *Tongass Sport Fishing Ass'n v. State*, 866 P.2d 1314, 1318 (Alaska 1994) (upholding salmon harvesting regulation giving preference to commercial fishers because sport and commercial fishers are not similarly situated); *Gilbert v. State*, 803 P.2d 391, 399 (Alaska 1990) (upholding distinction in harvest quotas for two fisheries based on "biological spawning patterns").

**18.** *See Brooks v. Brooks*, 733 P.2d 1044, 1053 (Alaska 1987).

**19.** Baxley is correct in pointing out that this court has adopted a sliding scale analysis to determine the level of scrutiny to apply to equal protection claims. *See State v. Enserch Alaska Constr.*, 787 P.2d 624, 631 (Alaska 1989). He

asserts that the court should use the sliding scale when analyzing his special legislation challenge. Baxley argues that, to determine where on the sliding scale the state and individual interests fall, the court should apply the Uniform Application Clause, which, he reasons, requires a showing of an important state interest and no less restrictive alternative to further it.

Our decisions interpreting article II, section 19 of the Alaska Constitution, however, have applied the less rigorous test used for nonsuspect classifications in equal protection cases. *See Lewis*, 559 P.2d at 643; *Abrams v. State*, 534 P.2d 91, 94–95 (Alaska 1975). We will analyze this claim under the standard applied in *Abrams* and *Lewis* because they deal specifically with article II, section 19 challenges instead of equal protection challenges.

leases were the State's only oil and gas leases auctioned with NPS as the bid variable. They are also the only State leases with NPS terms greater than 85%. (NPS terms in most State leases average about 30% to 40%.) The high NPS terms present the State with a unique problem: in the later years of the lease, the lessee would reap only a slight profit from continuing to extract oil, giving the lessee a strong incentive to abandon the field before extracting all the oil.[20]

Other features of the Northstar Unit distinguish these leases. The development account the Northstar lessees amassed over seventeen years is evidence of the difficulty of developing the fields. Development of the Northstar Unit will require new technology, including the first undersea pipeline in the Arctic Ocean—a technological advance that the legislature predicts will increase the value of other North Slope leases and increase State revenues. No State lessee had previously been obliged to develop such holdings under such lease terms.

The legislature conducted numerous public hearings and debates on the propriety of the proposed Act. It concluded that, if the leases were not amended, production in the Northstar Unit would probably not begin before 2002. It found that amending the leases "will maximize the economic benefits of oil and gas production to the people of the state by encouraging timely production from the unit." It also concluded that BP's timely development of the Northstar unit "may result in technological breakthroughs and other cost savings that may make other development opportunities in Alaska economically feasible." These legislative findings express the legitimate purposes of encouraging and providing for development of state resources

for the benefit of the people. *See* Alaska Const. art. VIII, §§ 1–2.[21]

Because the Act's exclusive focus on the Northstar leases reflects their unique nature, and because the Act fairly and substantially relates to legitimate state purposes, we hold that it is not special legislation. *See Lewis*, 559 P.2d at 643.

### E. The Commissioner's Authority

■ Baxley asserts that the Commissioner did not "have statutory authority under AS 38.05.180(j) to unilaterally reduce the net profit share in any Alaska oil lease."[22] Baxley argues that, although the Commissioner has statutory authority to change royalty payments, the Commissioner has no statutory authority to change NPS payments.

Baxley's argument, however, depends on our acceptance of his characterization of the Commissioner's actions. The Commissioner did not unilaterally reduce the NPS terms. The Commissioner merely negotiated a proposed reduction, which the legislature then approved. The negotiations would have had no binding effect unless the legislature approved the proposed amendments.

Baxley correctly notes that the Alaska Land Act (AS 38.05) does not grant or deny the Commissioner authority to negotiate proposed changes in the NPS terms. But particular provisions of the Alaska Land Act suggest that the Commissioner at least had the authority to negotiate the amendments, whether or not the Commissioner could have approved the lease amendments absent the 1996 Act here at issue. The Commissioner has broad supervisory power over the "administration of the division of lands." AS 38.05.020(a). The Commissioner may "enter into agreements considered necessary to carry out the purposes of this chapter, including

---

**20.** BP's president stated, "Once the net profit interest cuts in, ... some 90% or so of the revenue stream to the [Northstar lessee] would effectively dry up, and that would lead to the premature shut-down of the field." He asserted that "it would not be acceptable for BP, or I believe any other reputable oil company to continue to operate the field."

**21.** Article VIII, section 1 of the Alaska Constitution provides: "It is the policy of the State to encourage the settlement of its land and the

development of its resources by making them available for maximum use consistent with the public interest."

Article VIII, section 2 of the Alaska Constitution states: "The legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people."

**22.** AS 38.05.180(j) is set out, in part, at note 10, *supra.*

agreements with federal and state agencies." AS 38.05.020(b)(2). The Commissioner may also "exercise the powers and do the acts necessary to carry out the provisions and objectives of this chapter." AS 38.05.020(b)(4). The Commissioner's broad powers appear to us to include the authority to negotiate with a lessee wishing to change the terms of its lease; such negotiations with respect to a given lease and the pertinent circumstances may be acts necessary to further the objectives of the Alaska Land Act. We do not interpret AS 38.05.180(j) to prevent, expressly or impliedly, the Commissioner from negotiating proposed NPS amendments subject to legislative approval.[23]

The Commissioner's broad statutory powers authorized these negotiations; subsection .180(j) did not preclude them. We hold that the Commissioner did not exceed his authority.

### F. Public Notice Clause

■ Baxley argues that the Act violates the Public Notice Clause of the Alaska Constitution, which provides, "No disposals or leases of state lands, or interests therein, shall be made without prior public notice and other safeguards of the public interest as may be prescribed by law." Alaska Const. art. VIII, § 10. Baxley concedes that the public received notice of the legislature's approval of the proposed amendments.[24] He argues that the public should have received notice before the negotiations, and that, at the public hearings, other options (besides the proposed amendments negotiated by DNR and BP) should have been presented.

The Alaska Constitution does not express a requirement of pre-negotiation notice, and instead can be read to require notice before the State commits to an agreement requiring it to dispose of or lease state lands or interests in state lands. We assume for sake of discussion that amendment of the lease terms was a disposal or lease of an interest in state land. Regardless of the exact extent and timing of the notice required by the Public Notice Clause, we think that the process followed here satisfied that clause. The Commissioner presented the proposed amendments to the legislature, and nearly five weeks of spirited debate followed. We disagree with Baxley's contention that the "ink on the agreement was dry before it was submitted to the legislature": the public was still free to comment on the bill, and the legislature was still free to reject it. Because the public had ample opportunity to comment on the proposed lease amendments before the legislature authorized any binding changes, see Part III.D., supra, at 18, we conclude that the State did not violate the Public Notice Clause.

### G. Remaining Issues

#### 1. Constitutional requirement of forfeiture provisions

■ Baxley argues that the Commissioner violated article VIII, sections 8 and 11 of the Alaska Constitution by not requiring BP to forfeit the leases after BP announced its intention not to proceed with development.[25]

---

**23.** We do not decide here whether the Commissioner would have had the authority to modify the NPS terms without legislative approval.

**24.** Baxley argues, "The only aspect of Northstar for which the public received notice was the subsequent legislative ratification of a deal already struck, an agreement already made."

**25.** Article VIII, section 8 of the Alaska Constitution provides:

The legislature may provide for the leasing of, and the issuance of permits for exploration of, any part of the public domain or interest therein, subject to reasonable concurrent uses. Leases and permits shall provide, among other conditions, for payment by the party at fault for damage or injury arising from noncompli-

ance with terms governing concurrent use, and for forfeiture in the event of breach of conditions.

Article VIII, section 11 of the Alaska Constitution provides, in part:

Discovery and appropriation shall be the basis for establishing a right in those minerals reserved to the State which, upon the date of ratification of this constitution by the people of Alaska, were subject to location under the federal mining laws. Prior discovery, location, and filing, as prescribed by law, shall establish a prior right to these minerals and also a prior right to permits, leases, and transferable licenses for their extraction. Continuation of these rights shall depend upon the performance of annual labor, or the payment of fees, rents, or royalties, or upon other requirements as may be prescribed by law.

We decline to consider this issue because Baxley did not preserve it below. *See Brooks v. Brooks,* 733 P.2d 1044, 1053 (Alaska 1987). This issue presents a new constitutional theory and raises new fact questions about whether the leases' forfeiture provisions satisfied sections 8 and 11 and whether BP and the State complied with them. Because we believe that the State could not have gleaned this new constitutional argument from the pleadings, we decline to address it. *See Zeman,* 699 P.2d at 1280 (discussing bases for reaching on appeal issues not preserved below).

### 2. *Anticipatory breach*

 Baxley contends that BP anticipatorily breached the lease agreements, and that the State should have responded by rescinding the leases. This contract law argument turns on new facts and could not have been gleaned from the pleadings. *See Zeman,* 699 P.2d at 1280. Whether BP committed an anticipatory breach would depend on the outcome of potential fact disputes and a different body of case law. For example, it would raise the question of whether BP's communication to the State was a definite and unconditional repudiation of the contract, or merely an expression of concern with certain provisions in the lease. *See, e.g., Holiday Inns of Am., Inc. v. Peck,* 520 P.2d 87 (Alaska 1974). We therefore decline to address this argument.

### 3. *Separation of powers*

 Baxley argues that the legislature unlawfully infringed on the domain of the courts and violated separation of powers principles. This argument is not closely related to Baxley's superior court argument that the Commissioner lacked the authority to negotiate lease amendments; instead, it attacks the legislature's authority to consider

the proposed amendments. This argument could not have been gleaned from the pleadings. We therefore decline to address it. *See Zeman,* 699 P.2d at 1280.

Moreover, Baxley seems to assume that the legislature made a legal determination that the Commissioner's negotiations with BP were constitutional. It appears, however, that the Commissioner presented the legislature with proposed legislation, and that the legislature conducted its own investigation and debates on the propriety of the proposed Act and amendments. It does not appear that the legislature impermissibly intruded on judicial domain.

### 4. *Rule against material amendments*

 Baxley asserts that the Act violates the rule against material amendments to state contracts awarded through a public bidding process. He reasons that the Act may undermine public confidence in the integrity of the bidding process because it changes the leases' terms instead of rescinding them and offering them in a new auction.

 In general, competitively bid contracts involving state resources cannot be materially amended. *Kenai Lumber Co. v. LeResche,* 646 P.2d 215, 221 (Alaska 1982). The rationale behind this judicially created rule is that the amendment effectively produces a new contract, which the State should award only after a new round of public bidding. *McKinnon v. Alpetco Co.,* 633 P.2d 281, 287 (Alaska 1981).[26]

 We have never applied the rule to bar contract amendments approved by the legislature.[27] The superior court held that, "where the legislature itself amends a competitively bid contract, employing the committee and public hearing process, the need for the judiciary to protect legislative policy is essentially obviated." The superior court

---

**26.** We have explained:
> This rule has been judicially imposed in order to guard against circumvention of competitive bidding requirements. Competitive bidding itself is designed to ensure that government obtains the most favorable terms possible in its contracts, and to protect the public from the possibility of favoritism, fraud, and corruption on the part of public officials.

*Kenai Lumber Co. v. LeResche,* 646 P.2d 215, 220 (Alaska 1982).

**27.** *See, e.g., KILA, Inc. v. State,* 876 P.2d 1102 (Alaska 1994); *Kenai Lumber,* 646 P.2d at 217–23; *McKinnon v. Alpetco Co.,* 633 P.2d 281, 285 (Alaska 1981)

also reasoned that, because the legislature has the authority to create DNR and pass the leasing statutes, it would be illogical to conclude that the legislature lacks the authority to amend the leases. We agree. We believe the legislature's hearing process satisfies the policy considerations behind this rule. Therefore, we conclude that the material amendments doctrine does not apply to amendments approved by the legislature. We reject Baxley's challenge.

#### 5. *Public trust*

■ Finally, Baxley argues that the amendments violate the public trust doctrine. Baxley argues that the executive branch violated the public trust by not determining whether similarly situated parties existed before allocating resources to BP, by not "telling BP to develop the field or lose it," and by not offering the Northstar leases in another sale in January 1995.[28] He asserts that he raised this claim in the superior court, but he fails to cite where in the record he did so. Baxley did not raise this argument in his points on appeal and made only passing references to it in the superior court in connection with his Uniform Application Clause argument. The State contends that Baxley has raised this issue for the first time on appeal.

The public trust doctrine provides that the State holds certain resources (such as wildlife, minerals, and water rights) in trust for public use, "and that government owes a fiduciary duty to manage such resources for the common good of the public as beneficiary." *McDowell v. State*, 785 P.2d 1, 16 n. 9 (Alaska 1989). We apply basic principles of trust law to public land trusts. *State v. Weiss*, 706 P.2d 681, 683 n. 3 (Alaska 1985). One basic principle is that, when a trustee has discretion, a court will only review the trustee's acts for abuse of discretion. *See* William F. Fratcher, 3 *Scott on Trusts* § 187, at 14–19 (4th ed.1988); *see also Restatement (Second) of Trusts* § 187 (1959).

Baxley's argument consequently turns on a new body of case law, concerning fiduciary duty, and on new fact questions, concerning

possible abuse of the fiduciary's discretion. Because this argument is not closely related to Baxley's trial court arguments and could not have been gleaned from the pleadings, we decline to address it. *See Zeman*, 699 P.2d at 1280.

### IV. *CONCLUSION*

Because we reject Baxley's challenges to the Act, we AFFIRM the superior court's grant of summary judgment to BP and the State.

---

**28.** Baxley also seems to suggest that the legislature breached the public trust. Because he does not develop this argument, we decline to address

it. *See State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 528 (Alaska 1980) (declining to consider an inadequately briefed argument).